UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**UNITED STATES OF AMERICA,**  Criminal Case No. 3:10-CR-00475-KI

Plaintiff,  OPINION AND ORDER

v.

**MOHAMED OSMAN MOHAMUD,**

Defendant.

Amanda Marshall
United States Attorney
District of Oregon
Ethan D. Knight
Pamala Holsinger
Jolie F. Zimmerman
Assistant United States Attorneys
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204

　　　Attorneys for Plaintiff

Steven T. Wax
Federal Public Defender
Stephen R. Sady
Assistant Federal Public Defender
101 S.W. Main Street, Suite 1700
Portland, Oregon 97204

Attorneys for Defendant

KING, Judge:

Both the government and defendant plan to proffer expert witnesses on various subjects at trial. The defense objects to government witness Evan Kohlmann. The government objects to defense witnesses Dr. Marc Sageman, Dr. Fathali Moghaddam, and Dr. Elizabeth Cauffman. I held Daubert hearings over November 28-30, 2012. This opinion explains my rulings on the objections to the expert witness testimony.

## LEGAL STANDARDS

Federal Rule of Evidence 702 states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

    (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

    (b) the testimony is based on sufficient facts or data;

    (c) the testimony is the product of reliable principles and methods; and

    (d) the expert has reliably applied the principles and methods to the facts of the case.

The Court expounded on the application of Rule 702 in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). The subject of expert testimony must be scientific knowledge which will assist the trier of fact to understand or determine a fact in issue. Id. at 592. The focus of the court's inquiry is on the expert's methodology, not on his conclusions. Id. at 595.

"Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." Primiano v. Cook, 598 F.3d 558, 564 (9th Cir. 2010) (test under Daubert is the soundness of an expert's methodology and not the correctness of the expert's conclusions).

Factors to be considered when determining if the testimony is reliable scientific knowledge are whether the theory or technique is generally accepted in the relevant scientific community, whether it has been subjected to peer review and publication, whether it can be and has been tested, whether standards exist to control the technique's operations, and whether the known or potential rate of error is acceptable. Daubert, 509 U.S. at 593-94. The inquiry, however, is a flexible one. Other relevant factors may be considered and the factors listed in Daubert may not be reasonable measures of the reliability of expert testimony in a particular case. Id. at 594; Kumho Tire Company, Ltd. v. Carmichael, 526 U.S. 137, 147-153, 119 S. Ct. 1167 (1999). The court's "gatekeeping" obligation applies to technical and other specialized knowledge as well as scientific knowledge. Kumho, 526 U.S. at 147.

> Under *Daubert*, we must engage in a difficult, two-part analysis. First, we must determine nothing less than whether the experts' testimony reflects "scientific knowledge," whether their findings are "derived by the scientific method," and whether their work product amounts to "good science." Second, we must ensure that the proposed expert testimony is "relevant to the task at hand," i.e., that it logically advances a material aspect of the proposing party's case. The Supreme Court referred to this second prong of the analysis as the "fit" requirement.

Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1315 (9th Cir.) (internal citations omitted), cert. denied, 516 U.S. 869 (1995).

## DISCUSSION

I.    Inducement and Predisposition as Topics for Expert Witnesses

Several of the experts are prepared to opine on the two issues underlying the analysis of whether defendant was entrapped by the government–inducement and predisposition. The government argues that Rule 704(b) flatly prohibits opinions on this topic.

Federal Rule of Evidence 704(b) states:

> In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone.

The legislative history for the Amendment of Rule 704 states that the rationale for precluding ultimate opinion psychiatric testimony extends beyond the insanity defense and includes the lack of predisposition in entrapment. S. Rep. No. 98-225, at 230-31 (1985).

I agree with the government that the witnesses cannot opine on the ultimate issue of entrapment or the subissues of inducement and predisposition.

Indeed, "an expert witness cannot give an opinion as to her *legal conclusion, i.e.*, an opinion on an ultimate issue of law." Elsayed Mukhtar v. Cal. State Univ. at Hayward, 299 F.3d 1053, 1065 n.10 (9th Cir. 2002) (citing United States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994)), amended on other grounds, 319 F.3d 1073 (9th Cir. 2003).

> When an expert undertakes to tell the jury what result to reach, this does not aid the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's. When this occurs, the expert acts outside of his limited role of providing

the groundwork in the form of an opinion to enable the jury to make its own
informed determination.

Duncan, 42 F.3d at 101.

Defendant argues testimony about a mental condition is admissible as long as the testimony allows the jury to make the final decision, citing US v. Sandoval-Mendoza, 472 F.3d 645, 655-56 (9th Cir. 2006) (internal citation excluded).

> Predisposition or its absence is the focus of an entrapment defense. Therefore, medical expert opinion testimony showing that a medical condition renders a person unusually vulnerable to inducement is highly relevant to an entrapment defense. If it is adequately supported by medical expert opinion, it is admissible. Sandoval-Mendoza's experts were well qualified and had sufficient expertise in the neurology of brain tumors and his particular case to be useful to the jury. The district court's exclusion of medical expert opinion testimony prevented Sandoval-Mendoza from showing lack of predisposition, and thereby deprived him of a fair opportunity to defend himself. In this case, the foundation was sufficient. After hearing Drs. Mendius and Shore, the jury could have decided to disbelieve them. But Sandoval-Mendoza was entitled to have the jury decide upon their credibility, rather than the judge. As it was, the jury was left with nothing but unpersuasive lay evidence on a medical matter beyond what laymen could usefully testify about.

I agree the expertise and analysis leading up to the prohibited conclusion is a proper subject for testimony, particularly when it is beyond the knowledge of a lay juror. I am concerned, however, about experts repeatedly testifying that, for example, the average person of defendant's age is particularly vulnerable to inducement when subjected to various behaviors. I think this type of testimony comes too close to the ultimate issue. I am also concerned that the legal definition of inducement and predisposition, on which I will instruct the jury, varies from definitions used in the fields of the various experts. Dr. Moghaddam agreed he uses the definitions from his research and leaves the legal definitions to lawyers. Thus, I prohibit the experts, or the attorneys when questioning them, from using the terms inducement and predisposition. The experts can choose

appropriate synonyms. I limit the use of the terms inducement and predisposition to counsel's opening statements and closing arguments.

As an example, an expert may opine that a person with a particular attribute typically is especially vulnerable to adult influence, and defendant had that attribute. Defense counsel can then argue defendant was especially vulnerable and this trait allowed him to be induced. The government can use cross examination and argument to poke holes in the theory.

II. Terrorism Experts

A. Evan Kohlmann

Mr. Kohlmann is the government's expert on terrorism. He has a law degree and has been an international terrorism consultant since 2003. Mr. Kohlmann's company collects everything it can find on the Internet about terrorism fundraising, communication, and recruitment, and organizes the information into a database. The company monitors websites, email addresses, chat rooms, video recordings, and social networks for information. He also interviews terrorists, some by phone and others in person. Mr. Kohlmann has written about 40 papers; he wrote a few of these papers when he worked for the Investigative Project, and they were peer-reviewed. The journals' editors carefully reviewed two other papers, including one on his homegrown terrorist theory, but they were not formally peer-reviewed. The United States retained Mr. Kohlmann as an expert witness in 24 criminal cases. He has also testified as an expert for several foreign governments.

Mr. Kohlmann developed a list of principle factors as to whether a person might fit the profile of a homegrown terrorist, also known as a contemporary violent extremist. To develop the profile, he tracked online activity for hundreds of people as they progressed to violence. Certain

factors emerged over and over in people who had become violent. The factors include, but are not limited to:

> 1. The formulation of self-selecting schemes aimed at traveling abroad to join foreign terrorist organizations, attending training camps, and/or achieving imminent acts of physical violence;
>
> 2. Pre-existing connections to known extremist groups and accused terrorists;
>
> 3. The adoption of a hardline sectarian religious perspective;
>
> 4. The use of coded language and attempts at logistical subterfuge;
>
> 5. The deliberative collection and/or redistribution of terrorist propaganda; and
>
> 6. The browsing of Internet websites run by or on behalf of international terrorist organizations.

Mr. Kohlmann has not published the profile with the factors listed as bullet items in any of his published works. He explains that the factors are implicit in the published articles, due to the nature of the journals. Mr. Kohlmann has testified about this profile since 2009 and has used it in six criminal cases in the United States. Some of those cases do not use all six factors. Mr. Kohlman explained he focuses on the most germane factors and excludes factors which intersect with an element of the charged crime. Mr. Kohlmann admits there is no way to determine an error rate for people who visited certain websites but did not become violent. Similarly, there is no way to know if applying the profile captures all people who become violent.

Mr. Kohlmann believes that because the pool of terrorists is statistically small, one or two aberrant results will throw off a statistical analysis. He claims comparative analysis is the only accurate way to analyze some terrorism issues. Mr. Kohlmann analyzes the source material he gathers for reliability and then compares it to draw out common narratives. Mr. Kohlmann also

looks at extremists who are not violent. He claims certain Internet forums cater to people in this category. Mr. Kohlman tries to understand what distinguishes nonviolent extremists from extremists who become violent. His primary goal is to identify people before they become violent and enter the judicial system. He has never seen a person fitting the factors who does not eventually become a contemporary violent extremist. But he has seen lots of people who fit only one or two factors and who never become a contemporary violent extremist.

In his report, Mr. Kohlmann noted many pieces of evidence in this case which fall within his factors. Mr. Kohlmann concluded defendant closely fits the classic profile of a contemporary violent extremist because the evidence demonstrates nearly all of the relevant factors.

Defendant objects that Mr. Kohlmann's testimony fails to meet the Daubert standards and, in addition, is biased, exaggerated, and inaccurate. Defendant contends that Mr. Kohlmann is not using comparative analysis because he has no control group of people who do not become violent but engage in the same activities and thus fit the profile. Defendant is also concerned about the changing nature of the factors from case to case. He claims Mr. Kohlmann works backwards after a person is arrested for a violent act. Other than bias, defendant does not question Mr. Kohlmann's expertise on the history of terrorist organizations.

B. Dr. Marc Sageman

Dr. Sageman is the defense expert in terrorism threat assessment. He is a forensic psychiatrist and has a Ph.D. in political sociology. Dr. Sageman has worked as a consultant with various United States agencies and many foreign governments. As one example, he consulted with the New York City Police Department to help identify which young Muslims in the City who were bragging as if they were violent, and thus consuming City resources, might actually become violent.

PAGE 8 - OPINION AND ORDER

Dr. Sageman testified via Skype from Afghanistan, where he is currently working as a special advisor to the Deputy Chief of Staff of the International Security Afghanistan Forces (intelligence) on the issue of Afghan soldiers killing NATO soldiers. Dr. Sageman interviewed defendant prior to drawing his conclusions.

Dr. Sageman testified generally about the distinctions between the large number of people who discuss jihad and Islamic fundamentalism in person and on the Internet and the few people who turn to violent acts. He studied violent terrorists and used their nonviolent families and friends as a control group of 400 people. Dr. Sageman developed a model with 65 indicators that are divided into stages of an individual's turn to violence, which he believes is a process for an individual. Some of the indicators are joining a discursive political protest community, having an extreme view of Islam, participating in political protest online and offline, trying paramilitary training, and buying weapons. Dr. Sageman did not include FBI sting cases in his study because he does not consider those defendants to be real terrorists.

Dr. Sageman concluded that before any contact by an undercover employee, defendant had a low probability of turning to violence. Defendant fell in and out of the discursive political protest community. Some members of that community ultimately reject it and turn to violence because of moral outrage for the political killings. Those who turn to violence think political protests are ineffective. Dr. Sageman discounted several of defendant's activities which, to a lay person, would appear to fit one of his indicators. These included defendant writing the "Training without Weights" article for Jihad Recollections, having conservative Islam sermons on his computer, and owning a BB gun shaped like an AK47.

In summary, Dr. Sageman concluded defendant's age and personal issues made him vulnerable to inducement, which spawned a turn to violence in defendant that would not have occurred without the inducement.

The government objects to Dr. Sageman's opinion because it will not be helpful to the jury. The government argues jurors know the difference between writing and taking action. The government is concerned that rather than being objective, Dr. Sageman's analysis was informed by the law of entrapment. The government contends Dr. Sageman did not properly apply his methodology because he applied the 65 indicators without documenting the analysis.

C.   Dr. Fathali Moghaddam

Dr. Moghaddam is the defense expert in social psychology and the psychological changes involved in becoming a terrorist, a model he calls the staircase to terrorism. He is currently a professor of psychology at Georgetown University and the Director of the Conflict Resolution Program there. Dr. Moghaddam does research in his field and has written a long list of peer-reviewed publications.

The expert summary for Dr. Moghaddam states he will testify about the insights social psychology brings to the inducement that occurred in this case and how the government activity constituted inducement. More specifically, Dr. Moghaddam testified about several social psychology concepts: (1) the fundamental attribution error, the tendency for people to attribute causes to individual factors and discount situational factors; (2) authority and conformance, that normal people will conform to arbitrary norms, including harming others, if the situational factors are strong; (2) scaffolding, how behavior is shaped by teaching small steps toward the final goal; (3) cognitive dissonance, the internal pressure people have to act in accordance with previous ideas; (4)

PAGE 10 - OPINION AND ORDER

normalization and positioning theory, the way people use narratives to assign rights and duties to others and normalize behavior through positioning; and (5) that attitudes, such as the endorsement of terrorism, are a poor predictor of actual behavior, such as committing terrorist acts. Dr. Moghaddam applied these social psychology concepts to defendant's interactions with government agents to explain why defendant progressed to attempting to detonate a device. The concepts are counterintuitive to how people untrained in social psychology interpret situations such as defendant's.

Dr. Moghaddam published his staircase to terrorism model in a peer-reviewed journal, American Psychologist, in 2005. There was no testimony about how he tested his model or whether it is well-accepted by his peers. Dr. Moghaddam stated he accepted this case because it cries out for social psychology concepts to interpret the framework created around defendant as a situational constraint leading to a particular behavior.

The government claims Dr. Moghaddam's testimony about general social psychology topics would be confusing and unhelpful to a jury because he did not apply the concepts to FBI sting cases when he did his research.

D. Analysis

These three experts created what have been described as models or profiles which are meant to explain when, whether, why, and if a person has progressed from holding nonviolent political views to being capable of violent terrorism. Mr. Kohlmann applies the facts of a case to his factors; Dr. Sageman applies the facts to his indicators.

I find that all three terrorism experts can provide insight into the terrorism community that would assist the jury. I do not believe the jury would have experience with the websites that will be

PAGE 11 - OPINION AND ORDER

brought into evidence in this case, or the content of the discussions therein. The social psychology concepts are also unknown territory for a lay person and are relevant to the issues to be decided. All three experts have published their work, although Mr. Kohlmann's latest publications have not been in peer-reviewed journals. This fact, along with no known error rate and no formal control group for Mr. Kohlmann's work, as well as Dr. Sageman's lack of documentation for his analysis of the 65 indicators, are issues that can be explored in cross examination. I also acknowledge that terrorism does not lead itself to strict scientific study that the court would expect in the testing of a new medication. I do not find that any of the issues raised by counsel on either side discredit the experts' methodologies to the point the court should exclude their testimony.

I am concerned, however, about an expert labeling defendant as a homegrown terrorist, a contemporary violent extremist, or on the flip side, a person who had not turned to violence or traversed the staircase to terrorism prior to government contact. These labels are code words for predisposition. Thus, I prohibit testimony on this ultimate mental state. The experts may explain the factors and indicators derived from their research; may explain whether people demonstrating these factors and indicators are violent or not, in the experts' experience; and may explain how well defendant fit the factors and indicators. But the experts may not testify on the ultimate label they would affix to defendant.

V. Dr. Elizabeth Cauffman

Dr. Cauffman is the defense expert in developmental psychology and adolescent development. She is currently a professor at the University of California, Irvine, in the Departments of Psychology and Social Behavior, and Education. Dr. Cauffman has extensive research experience

and a lengthy list of peer-reviewed publications. The government does not challenge her credentials in adolescent brain development.

Based on the research and literature in her field, Dr. Cauffman will testify about the development of the adolescent brain and the maturity gap between cognitive and emotional development. She will explain how certain attributes of the interaction between defendant and the undercover employees affect typical adolescents. For example, according to Dr. Cauffman, adolescents are very sensitive to awards, particularly from older, respected adults. Dr. Cauffman will relate this psychological fact to comments the undercover employees made to defendant which she considers to be praise and flattery, and she will explain the effect on the typical adolescent.

The government objects to Dr. Cauffman's testimony because it contends she will only confuse the jury. Dr. Cauffman did not interview defendant, so she can only testify about typical adolescents. The government is concerned the jury will conclude that no one less than 25 years old should be held criminally accountable because the person's brain is not fully developed.

There is no evidence that Dr. Cauffman's testimony is based on anything other than generally accepted theories that have been peer-reviewed, published, and now taught at universities. I find her testimony to be good science under the Daubert factors. Due to the age of defendant when he interacted with the undercover employees and received the Bill Smith emails, Dr. Cauffman's testimony will help the jury understand the evidence when it is analyzing the entrapment defense. The government's fear about the application of the theory absolving younger defendants of all criminal liability is best resolved through cross examination.

## CONCLUSION

I will allow all of the expert witnesses who drew objection to testify at trial, but limit the testimony as explained above.

IT IS SO ORDERED.

DATED this 4th day of January, 2013.

/s/ Garr M. King
Garr M. King
United States District Judge