**Stephen R. Sady**
**Chief Deputy Federal Public Defender**
**steve_sady@fd.org**
**Steven T. Wax**
**Federal Public Defender**
**steve_wax@fd.org**
**Lisa Hay**
**Assistant Federal Public Defender**
**lisa_hay@fd.org**
**101 S.W. Main Street, Suite 1700**
**Portland, Oregon 97204**
**503-326-2123 Telephone**
**503-326-5524 Facsimile**

**Attorneys for Defendant**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **Case No. 3:10-cr-00475-KI-1** |
| Plaintiff, | |
| v. | **DEFENDANT'S SENTENCING MEMORANDUM** |
| **MOHAMED OSMAN MOHAMUD,** | |
| Defendant. | |

**TABLE OF CONTENTS**

Page

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A.      Mohamed's Positive History And Characteristics Warrant A Substantially Mitigated
         Sentence (18 U.S.C. § 3553(a)(1)). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

         1.      Mohamed's Family History Provided Him With Positive Values As Well As
                 Difficulties That Made Him Vulnerable To Extremist Propaganda And Later
                 To The Government Operatives. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

         2.      Mohamed Has Unequivocally Renounced Extremism And Taken Concrete
                 Actions To Atone For His Conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

         3.      Mohamed's Radicalization Was Tempered By Behavior And Beliefs In The
                 Community That Are Inconsistent With Extremist Violence. . . . . . . . . . . . . . . 9

         4.      Mohamed's Youth Both Mitigates His Culpability And Favors Future Good
                 Conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

         5.      Mohamed's Involvement With Drugs And Alcohol During The Relevant
                 Time Mitigates The Offense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

         6.      Mohamed's Known Vulnerability To Manipulation Warrants A Lower
                 Sentence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

         7.      Mohamed's Lack Of Capacity To Commit The Offense On His Own
                 Warrants A Mitigated Sentence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

         8.      Mohamed's Maturation And Efforts To Improve Himself While In Custody
                 Favor A Lower Sentence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

B.      The Nature And Circumstances Of The Offense Warrant A Substantially Mitigated
         Sentence (18 U.S.C. § 3553(a)(1)). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

         1.      While Not A Complete Defense, Imperfect Entrapment Warrants A Mitigated
                 Sentence Untethered To The Guidelines. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

         2.      Prior To Government Contact, Mohamed Did Not Plan Or Prepare A
                 Terrorist Act In The United States. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

3.      At Worst, Mohamed's Inchoate Interest In Helping Others Abroad Would Be Punishable As Attempted Material Support, With A Fifteen Year Maximum Sentence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

4.      The Social Psychology Dynamics Of Conformity And Compliance With Authority During The Offense Provide Bases For A Mitigated Sentence. . . . . . . 24

5.      Tactical Choices Regarding The Offense Are Relevant To Sentencing Entrapment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

6.      Without Government Involvement, The Bomb Plot Would Never Have Occurred. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

C.     The Goals of Sentencing Would Be Served By A Sentence Not Greater Than Ten Years (18 U.S.C. § 3553(a)(2)). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

1.      The Seriousness of The Offense Requires A Period Of Incarceration (18 U.S.C. § 3553(a)(2)(A)). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

2.      The Requested Sentence Provides Adequate General Deterrence To Criminal Conduct, While Recognizing That The Parents' Involvement In Calling The FBI Calls For A Reduced Sentence (18 U.S.C. § 3553(a)(2)(B)). . . . . . . . . . . . . 30

3.      Psychiatric Evidence Demonstrates That Mohamed Presents A Low Risk To The Public For Future Crimes (18 U.S.C. § 3553(a)(2)(C)). . . . . . . . . . . . . . . . 31

4.      The Most Effective Manner Of Providing Mohamed With Needed Training And Treatment Is To Permit Release To Community Corrections As Soon As Possible (18 U.S.C. § 3553(a)(2)(D)). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

D.     The Harsh Types Of Custody Mohamed Will Likely Endure Favor A Shorter Period Of Incarceration (18 U.S.C. § 3553(a)(3)). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

E.     The Guidelines Do Not Anticipate Cases Of Imperfect Entrapment Or Other Grounds That Favor A Mitigated Sentence (18 U.S.C. § 3553(a)(4)). . . . . . . . . . . . . . . . . . . . . 35

1.      Departure Based On Over-Representative Criminal History Under U.S.S.G. § 4A1.3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

2.      Departure And Variance For Post-Offense Rehabilitation Under *Pepper v. United States*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

3.    Departure And Variance For Acceptance Of Responsibility By Analogy To U.S.S.G. § 3E1.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

F.    Although Mohamed's Case Is Unique, The Range Of Sentences Imposed In Other Sting Cases Establishes A Much Lower Range Than Provided By The Guidelines (18 U.S.C. § 3553(a)(6)). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

G.    Mohamed Should Not Receive A Harsher Sentence For Exercising His Right to Trial (Sixth Amendment). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

H.    The Government's Motion For A Downward Departure For Substantial Assistance Warrants An Additional Reduction Of The Sentence (28 U.S.C. § 994(n)). . . . . . . . . . 47

I.    The Court Should Recommend A Designation Favoring Family Unification And Access To Programming (18 U.S.C. § 3621(b)). . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

**TABLE OF AUTHORITIES**

**Page**

**FEDERAL CASES**

*Gall v. United States*,
    552 U.S. 38 (2007)............................................. 14, 21, 41, 46

*Kimbrough v. United States*,
    552 U.S. 85 (2007)................................................ 46

*Koon v. United States*,
    518 U.S. 81 (1996)............................................ 20, 36, 41

*Roper v. Simmons*,
    543 U.S. 551 (2005)........................................... 11, 14, 15

*Simmons v. United States*,
    390 U.S. 377 (1968)............................................... 46

*Spears v. United States*,
    555 U.S. 261 (2009)............................................. 37, 46

*United States v. Alessandroni*,
    982 F.2d 419 (10th Cir. 1992)...................................... 36

*United States v. Aref*,
    No. 04-CR-402, 2007 WL 804814 (N.D.N.Y. Mar. 14, 2007)................. 36

*United States v. Banulos-Rodriguez*,
    215 F.3d 969 (9th Cir. 2000)..................................... 44, 45

*United States v. Benkahla*,
    501 F. Supp. 2d 748 (E.D. Va. 2007). ............................... 36

*United States v. Cabrera*,
    567 F. Supp. 2d 271 (D. Mass. 2008). ............................... 14

*United States v. Carty*,
    520 F.3d 984 (9th Cir. 2008)....................................... 21

*United States v. Cortes*,
    299 F.3d 1030 (9th Cir. 2002)................................... 42, 43, 44

*United States v. Garza-Juarez*,
     992 F.2d 896 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Henderson*,
     649 F.3d 955 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Ing*,
     70 F.3d 553 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 44

*United States v. Johnson*,
     956 F.2d 894 (9th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Kindle*,
     698 F.3d 401 (7th Cir. 2012), *vacated pending en banc review.* . . . . . . . . . . . . . . . . . . 23

*United States v. Marcial-Santiago*,
     447 F.3d 715 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*United States v. McClelland*,
     72 F.3d 717 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*United States v. McKinney*,
     15 F.3d 849 (9th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43, 44

*United States v. Meskini*,
     319 F.3d 88 (2d Cir. 2003).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Mohrbacher*,
     182 F.3d 1041 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Ochoa-Gaytan*,
     265 F.3d 837 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Pepper*,
     131 S. Ct. 1229 (2011).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 41, 42, 46

*United States v. Poehlman*,
     217 F.3d 692 (9th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Sandoval-Mendoza*,
     472 F.3d 645 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Takai*,
    941 F.2d 738 (9th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Thurston*,
    CR 06-60069-01-AA, 2007 WL 1500176 (D. Or. May 21, 2007). . . . . . . . . . . . . . . . . 36

*United States v. Todd*,
    627 F.3d 329 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Watt*,
    910 F.2d 587 (9th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

## FEDERAL STATUTES AND GUIDELINES

18 U.S.C. § 2339A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

18 U.S.C. § 3553. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

18 U.S.C. § 3621. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

28 U.S.C. § 994. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 47

U.S.S.G. § 3A1.4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36, 37, 38

U.S.S.G. § 3E1.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43

U.S.S.G. § 4A1.3(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36, 38

U.S.S.G. § 5G1.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

U.S.S.G. § 5K1.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 48

Anti-Terrorism and Effective Death Penalty Act, Pub. L. No. 104-132, § 730, 110 Stat.
    1214, 1303 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38

Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 120004,
    108 Stat. 1796, 2022 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

**Stephen R. Sady**
**Chief Deputy Federal Public Defender**
**steve_sady@fd.org**
**Steven T. Wax**
**Federal Public Defender**
**steve_wax@fd.org**
**Lisa Hay**
**Assistant Federal Public Defender**
**lisa_hay@fd.org**
**101 S.W. Main Street, Suite 1700**
**Portland, Oregon 97204**
**503-326-2123 Telephone**
**503-326-5524 Facsimile**

**Attorneys for Defendant**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **Case No. 3:10-cr-00475-KI-1** |
| **Plaintiff,** | |
| **v.** | **DEFENDANT'S SENTENCING MEMORANDUM** |
| **MOHAMED OSMAN MOHAMUD,** | |
| **Defendant.** | |

**Introduction**

This case presents the Court with a difficult and unique sentencing decision.  The Court, by

presiding over extensive pretrial proceedings and the trial, is very familiar with the unprecedented

**PAGE 1    DEFENDANT'S SENTENCING MEMORANDUM**

circumstances surrounding the case. This sentencing memorandum expands on the offense and Mohamed's personal characteristics that warrant a substantially mitigated sentence based on the sentencing factors set out in 18 U.S.C. § 3553(a). Among the constellation of factors that make this case unique are:

- Mohamed's early renunciation of and apology for his conduct, confirmed by his four pretrial meetings with the government, during which he provided complete and truthful answers to national security questions and offered to assist the government in educating other Muslim youth regarding the dangers of internet propagandists;

- A legal framework that encourages departure from the Guidelines based on imperfect entrapment, which is uniquely available under the facts of this case, especially because, as the presentence investigation report confirms, "there is no evidence that he planned or intended to personally carry out a terrorist attack within the United States prior to his contact with" the undercover operatives;

- The unprecedented extent of pre-offense government involvement, with twenty months of activity beginning with six months of surveillance while Mohamed was a juvenile, email contact from Bill Smith that validated and encouraged extremist views at a time the FBI viewed Mohamed as being a "conflicted/manipulable kid", and hands-on direct interaction from skilled and sophisticated operatives who, at least from the third meeting, directed Mohamed in a manner "to be sure Mohamed stays on course and follows the plan he came up with";

- The parents' involvement in bringing Mohamed to the attention of the FBI that militates in favor of a mitigated sentence to further the policy of encouraging community members to communicate with the authorities, knowing their loved ones will not be treated with undue harshness;

- Reports from two psychiatrists who find Mohamed is a low risk of future dangerousness given his response to his arrest and the absence of psychological indicia of being a violent person outside the unique circumstances of the offense;

- Extraordinary post-offense rehabilitation in Mohamed's activities in custody including positive interactions with staff and other inmates, a wide range of reading and study to make himself a better person, and his determination to

**PAGE 2     DEFENDANT'S SENTENCING MEMORANDUM**

never be in a position that repeats the shameful type of conduct that brings him before the Court.

The structure of this memorandum begins with a biographical narrative, then addresses the factors that make the requested sentence of no more than ten years imprisonment "sufficient, but not greater than necessary to comply with the purposes" of the sentencing statutes under 18 U.S.C. § 3553(a).

**A.      Mohamed's Positive History And Characteristics Warrant A Substantially Mitigated Sentence (18 U.S.C. § 3553(a)(1)).**

We hope the Court has observed during this case the same courteous, intelligent, and accessible person the defense has had the pleasure to represent for the past 31 months.  Mohamed is a young man with many positive characteristics that are relevant to sentencing because his traits provide strong evidence that he will not pose a future danger to the community.  Most importantly, Mohamed has unequivocally and emphatically renounced any allegiance to extremists who would use violence to further their goals.

**1.      Mohamed's Family History Provided Him With Positive Values As Well As Difficulties That Made Him Vulnerable To Extremist Propaganda And Later To The Government Operatives.**

Until sometime during the tenth grade, Mohamed grew up as a normal immigrant American, taught to love and appreciate America as having saved his and his family's lives.  As a teenager, he began to become more attuned to his differences, undergoing what his father described at trial as an "identity crisis."  The family history is important to sentencing because Mohamed's baseline growing up, and the one to which he now adheres, is prosocial and positive, while at the same time the family's unique and dramatic history provide the backdrop for the identity issues that played a role in Mohamed's conduct.

**PAGE 3    DEFENDANT'S SENTENCING MEMORANDUM**

Mohamed was born on August 11, 1991, in Mogadishu, Somalia, during the civil war that plunged that country into anarchy. His father, Osman, was an engineer who spoke five languages; his mother, Mariam, was nineteen when Mohamed was born. Mohamed's birth story includes confrontations with armed thugs on the way to the hospital and an Italian doctor who agreed to help with the breech birth. While Mohamed was an infant, the family underwent many hardships and dangers as they tried to survive the conflict, traveling frequently to seek safety. Because Osman was educated, he was a target of the fighting factions. The family experienced the traumas of marauding gunmen, food scarcity, and the uncertainty of day-to-day survival.[1]

During the tumult of war, the infant Mohamed and his mother became separated from his father, Osman. His mother traveled through war-torn Somalia to Kenya, during which time she and Mohamed spent terrible times of isolation, hunger, and fear. Their lives were only somewhat better during their time as refugees in Kenya. As Mariam told us early on, she felt that she nursed Mohamed on her blood. Meanwhile, Osman, through a relative who worked with the American embassy, was able to emigrate from Somalia to the United States. With the assistance of a church group, he became established in Portland, finding whatever work he could as a lot attendant, taxi driver, and production line worker.

Through a refugee website, Osman found his family and arranged for them to join him in Hillsboro. Mohamed's first memory is of eating a meal on the plane from Africa to Portland. Shortly after Mohamed arrived, his doctors diagnosed him as failing to thrive as a result of malnutrition. Many of Mohamed's teeth were pulled because of his lack of proper nutrition and

---

[1] The conditions in Somalia are elaborated in the attached reports regarding Habibo Yusuf Mohamed and Ahmed Iid (Exhibits A and B).

PAGE 4    DEFENDANT'S SENTENCING MEMORANDUM

dental care. One of the church sponsors remembers that, upon first meeting Mohamed, he kissed her hand as a gesture of traditional Somali respect.

Osman's work ethic and intelligence led him up the ladder to more and more responsibility at Intel, where he is now a software engineer. The family evolved into a leadership position in the Somali community, helping new arrivals to acclimate to their new country. Mohamed quickly learned English and adapted to life in America. Osman and Mariam are moderate Muslims who were strongly intent upon assimilation and success for their children. When Mohamed was six, the family experienced another trauma when the apartment they lived in burned down, destroying all their possessions. Osman describes passing Mohamed and his sister, Muna, out of the second story window by unrolling them from a blanket to Mariam. Osman found a new place to live and, once more, they started over.

Now the oldest child of three children, Mohamed adapted as expected with normal schooling, sports, and diverse friends. His mother entered the work force in a mail facility where she is still employed. Mohamed developed close relationships with a number of his teachers and enjoyed school. His reading included the Harry Potter books, which he especially liked because his age corresponded to the protagonist who grew older as the series developed. Mohamed participated in summer three-on-three basketball tournaments and swam at the local recreation center. When he was 15, Mohamed won a contest that resulted in the recording played at trial that shows him describing natural beauty, opportunities, and diversity as things he loved about Oregon. However, he also had a growing awareness of differences based on his Muslim religion, his Somali culture, and the color of his skin.

Mohamed's life became more difficult during that same year as his family unit – which from his youth, culture, and religion, he considered inviolable – began to crumble.  His parents were fighting (and eventually divorced), and he in turn developed questions regarding his parents' relatively lenient practice of their religion.  He had a religious experience in which he felt his heart was cleansed, which led him to want to learn more about his religion.  One of the first questions was about music – his father told him about the relatively restrictive Islamic view of instrumental music, while at the same time having tapes of music in his car.  Puzzled by this contradiction, Mohamed began frequenting websites to learn more about Islam and stumbled upon sites sponsored by skilled extremist propagandists, including Samir Khan.

The extreme ideas advocated on these websites were generally off limits for discussion with family, friends, and co-religionists in the wake of 9/11, which prevented more moderate voices from providing alternative interpretations of certain religious concepts such as jihad.  Even as he became influenced by the propaganda sites, Mohamed also maintained his interests in work, school, sports, and friends.  Influenced by the extremist propagandists, he developed a challenging attitude toward what he perceived as hostility toward Muslims, but also had conflicting ideas about those views.  In the end, he determined – and repeatedly expressed – that he wanted to travel to a Muslim country to study his religion and Arabic and decide for himself what he should do.

As the Court heard during the trial, Mohamed's internet activity as a minor included writing articles for publication in Jihad Recollections and posting extremist statements.  He also had friends through the mosque who supported his Muslim identity, and he stayed in touch with friends from Portland who had gone overseas.  In his internet activity, he sometimes expressed inflammatory views that were inconsistent with other of his beliefs and, often, contrary to the facts of his life.  We

have canvassed his friends and associates who have known him for years. Almost all express shock and disbelief that he acted as he did, describing him as a funny, kind, goofy young man who would not hurt others.

> **2. Mohamed Has Unequivocally Renounced Extremism And Taken Concrete Actions To Atone For His Conduct.**

Mohamed's letter to the Court reflects his deep and sincere revulsion at his actions and apology to the Court and the community. Exhibit C. From the outset of this case, Mohamed was prepared to take appropriate action to begin atoning for his offense conduct. On the day of Mohamed's first appearance in court, the defense called the government to make sure the government had no immediate need for time-sensitive information. The parties agreed then, and again thereafter, that we should proceed with discovery before addressing the question of assistance to the government. After a meeting on June 1, 2011, the government advised that the time had come to decide whether to provide information. With no commitments on either side, the defense promptly requested a proffer agreement, and we arranged the first meeting for June 26, 2011. We met for several hours during which prosecutors and FBI agents asked wide-ranging questions, to which Mohamed provided truthful and complete answers. The same group, with some others, met again for almost three hours on July 24, 2011, on September 6, 2011, and on October 4, 2011.

Mohamed's assistance to the government reflects his deep regret at his conduct and his desire to make amends. From our first meeting with Mohamed the day after his arrest, we could see he was a confused and conflicted young man, as we described him at that time – before receiving in discovery the FBI's almost identical characterization of Mohamed. This confusion is also reflected in the initial conversation with the psychiatric nurse the morning after his arrest when Mohamed wept, saying "he just couldn't figure out how he had gotten from just being a student to being labeled

**PAGE 7    DEFENDANT'S SENTENCING MEMORANDUM**

as a terrorist in jail." RT at 2297. As we learned more about Mohamed, he plainly did not seek to justify his actions and only became clearer and clearer in his rejection of extremist positions.

Mohamed's letter of December 22, 2010, demonstrates appropriate remorse, apology, and recognition of the seriousness of his acts. Exhibit D. The defense provided Mohamed's early renunciation letter to the Court on April 27, 2011, in a sealed submission and, six months later, to the government. The government has also submitted to the Court under seal the FBI Form 302 summaries of the four proffer sessions, covering approximately 12 hours over the summer of 2011, during which Mohamed provided the government with a detailed account of his conduct. The government indicated at all times satisfaction with the candor and completeness of the cooperation. The types of information Mohamed conveyed are important to national security: he provided the government with an articulate and transparent view into the radicalization process to assist the government in thwarting future potential threats. He also offered to provide public statements as the government deemed useful to discourage young Muslims from being sucked in by extremist propaganda. Although to date the government has not followed up on this offer, Mohamed remains prepared to do so. On advice of counsel, he has not acted independently from the government on the theory that such actions could be misinterpreted or otherwise be ineffective without coordination with the government.

Mohamed did more than just admit the conduct necessary to establish the offense: he extensively proffered with the express hope that his actions would assist the government with national security issues. Mohamed has clearly and emphatically demonstrated by words and actions that he rejects the justifications for violence articulated by the propagandists who had been

**PAGE 8    DEFENDANT'S SENTENCING MEMORANDUM**

influencing him.   These actions demonstrate that a mitigated sentence is warranted based on a number of sentencing factors, especially the reduced need for specific deterrence.

**3.    Mohamed's Radicalization Was Tempered By Behavior And Beliefs In The Community That Are Inconsistent With Extremist Violence.**

There is no question that Mohamed became enthralled with extremist websites and wrote diligently for Jihad Recollections and on other internet sites.  At the same time, his other actions and behavior reflected his character and upbringing: he was friendly and cared for a wide and diverse friendship group; he was accessible and helpful with his teachers; and he had goals and ambitions consonant with his parents' hopes and expectations.  This conflict between radical influences and prosocial upbringing manifested itself in his talk of traveling to Yemen.  On August 31, 2009, he was 18 and had his passport; if he was determined to leave, he could have.  Instead, with no ticket or visa, he called his parents who, predictably, put an end to the plan.  If Mohamed had fully adopted the radical beliefs, he would not have alerted his parents and allowed them to end his plans.  Dr. Sageman described Mohamed's half-hearted efforts at travel as "almost like a cry for help."  RT at 2467.

Once study abroad was deferred until after graduation, Mohamed began college, where he met new people and began a whole new phase of his life.  As the FBI agent in charge of surveillance stated, he was conflicted and not nearly as involved as he had been on the internet.  In the Fall of 2009, SA Isaac Delong described Mohamed as "a pretty manipulable, conflicted kid" in an internal FBI email.  RT at 1466.  Delong also concluded: "Since he began studying at Oregon State University, it appears for the most part he has left behind his radical thinking."  CR 386-1 at 1.  Similarly, SA Christopher Henderson emailed that Mohamed "appears to be a confused college kid that talks mildly radical jihad out one ear, and typical 18 year-old college kid (drugs, sex, and

PAGE 9    DEFENDANT'S SENTENCING MEMORANDUM

drinking) out the other." CR 386-2 at 2. When he did go on line, he was looking for support: as he wrote to one Islamic website, "All I need is some soft words to help my heart and supporting advice." RT at 1763.

During trial, the Court heard testimony that strongly supports Mohamed's positive traits. During elementary and middle school, Mohamed was described as "very friendly to everyone in general." RT at 2277 (Joshua Alinger). This continued into high school, where fellow students considered him "fun loving, goofy," and "nice." RT at 2291 (Rachel Hanna). He was well-liked by his teachers, had a wide circle of diverse friends, was communicative and respectful, and was thought of as a "great kid." RT at 2285, 2287-88 (James Duncan). Likewise, Mohamed's employer during the summer of 2009 described him as a "respectful," "good-natured kid" who could be trusted and left in charge without supervision. RT at 2272, 2275-76 (Robert Garcia).

Fellow students and staff at Oregon State University described Mohamed in largely the same terms. Mohamed was seen as "an average college student" who enjoyed social activities, studying, going to parties, singing, dancing, and attending college football games. RT at 1873-74 (Luis Martinez), 1893 (Raed Abdelli). A friend and roommate described Mohamed as "a very social, energetic kid," a "[v]ery happy person," and "[s]erious about his studies." RT at 2178 (Mohammad Mohamed). Mohamed volunteered at and supported numerous causes, including raising awareness of HIV/AIDS in Africa and assisting in OSU's Black History Month. RT at 2400-01 (Earlean Huey). He also had a prime role in an African Student Association play that explored "important themes in African culture," including the generation gap and the "empowerment of women." RT at 2406 (Brian Gatimu). As in high school, Mohamed had a wide group of diverse friends from various ethnic and religious backgrounds, and they spoke openly and freely with each other about their

PAGE 10   DEFENDANT'S SENTENCING MEMORANDUM

beliefs.  RT at 1858-59 (Elyssa Ridinger), 1872 (Luis Martinez), 2405 (Brian Gatimu).  Indeed, Mohamed "kind of knew everybody," was "very friendly," and was friends with all kinds of different people, regardless of race or creed.  RT at 1858 (Elyssa Ridinger), 1872 (Luis Martinez), 2401 (Earlean Huey).

As the Court assesses Mohamed for sentencing purposes, Mohamed's positive attitude in the community and good past behavior are important evidence of his lack of future dangerousness and of mitigation regarding the influences brought to bear on him in the context of imperfect entrapment.

### 4.    Mohamed's Youth Both Mitigates His Culpability And Favors Future Good Conduct.

> [A]s any parent knows and as the scientific and sociological studies respondent and his *amici* cite tend to confirm, "[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions."  It has been noted that "adolescents are overrepresented statistically in virtually every category of reckless behavior."

*Roper v. Simmons*, 543 U.S. 551, 569 (2005) (citations omitted).  The Court heard testimony at trial from Dr. Elizabeth Cauffman, one of the country's foremost experts in developmental psychology and adolescence.  Her trial testimony provides important sentencing mitigation based both on Mohamed's young age at the time of the offense and on the specific characteristics of Mohamed.

As Mohamed's father told the FBI on August 31, 2009, about Mohamed's lack of maturity: "although Mohamed is technically an adult, he is still a child."  RT at 1472.  Dr. Cauffman likewise found examples of that immaturity throughout the interaction between Mohamed and the agents.  She testified that Mohamed was "a typical college kid with some really immature behaviors" who was "[n]ot very sophisticated."  RT at 2339, 2343.  Dr. Cauffman noted the relatively minor participation of Mohamed, where many of his contributions to the discussions "were very small"

and, as his question about bringing a hat and sunglasses reflected, "very immature."  RT at 2362.

She found the social influence, especially praise and flattery, to have had a heightened effect due to

his vulnerability as an adolescent who was still immature.  RT at 2375.

In her testimony regarding the characteristics of youth, Dr. Cauffman pointed to three key

mitigating factors.  First, studies have identified a gap between intellectual maturation and judgment,

proving that, although intellectual growth can reach its baseline early in adolescence, the judgment

to make mature decisions does not reach the same level until years later.  As reflected in the chart

in Dr. Cauffman's presentation, Mohamed during the time leading to and at the time of the offense

was intellectually mature but lacked the maturation of good judgment that he is now reaching as he

gets older.  Exhibit E.  This lack of maturity in youth can now be understood through advances in

brain science that establish that the frontal lobe – "the part of the brain that regulates, controls, and

modulates" behavior and emotional responses – is not fully developed until age 25.  RT at 2344-49;

*see also* National Institute of Health Publication 4929, *The Teenage Brain: A Work In Progress*

(2008).

Second, Dr. Cauffman provided the scientific support for the common sense notion that

young people are easily influenced.  Adolescents are "very sensitive to rewards" (RT at 2352):  "[I]f

you praise a kid, and that's rewarding to them, they're very likely to engage in behaviors that would

then help continue facilitating that type of reward."  RT at 2360.  During the trial, the Court heard

numerous examples of praise and flattery – especially during the early meetings:

> "He's an amazing nineteen year old."
> "I got a very talented young man in our midst right now."
> "You should teach a writing class."
> "By the way you write, I'd imagine uh, school comes kind of easy for you?"
> "You got a lot of talent brother Mohamed."

**PAGE 12   DEFENDANT'S SENTENCING MEMORANDUM**

> "You're probably smarter than most people that's why, 'cause college doesn't come that easy to people."
> "If it helps you at all, gives you a big head or whatever, man I had to travel far to talk to people about you, face to face."
> "I think you, you can be a great poet you know to write stuff and so on."
> "All we know is what we see from you, we're impressed, you know."
> "I found, I found a, a jewel, you know, in the rough."
> "We love you for the sake of [God]…"
> "I'm telling you I trust you with my life, I hope you trust me with your life."

Especially in the context where the agents assumed the role of "the authority figure" to Mohamed, and there was a "social hierarchy between them," the influence of the agents was unusually powerful in inducing Mohamed to continue along the road to the offense. RT at 2368. These authority figures always encouraged extremist actions.

Third, Dr. Cauffman testified that the character of a juvenile is more transitory and less well-formed than that of an adult:

> Adolescents are moving targets. Their characters are not fully formed. They're more malleable. Who you are at 18 isn't necessarily who you are at 38 or 58. And one of the things we know is that development is still ongoing at that time.

RT at 2374. Because their characters are not fully formed, adolescents will "engage in behavior that isn't necessarily true to who they are, but it's driven or borne out by a desire to please others, try something on." RT at 2373. Dr. Cauffman identified examples of this behavior in the interactions between Mohamed and the agents.

These three defining characteristics of youth – immaturity, vulnerability, and malleable identity – have all been recognized by the Supreme Court as factors that warrant a lesser punishment for juveniles tried as adults:

> The susceptibility of juveniles to immature and irresponsible behavior means "their irresponsible conduct is not as morally reprehensible as that of an adult." . . . Their own vulnerability and comparative lack of control over their immediate surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape

**PAGE 13    DEFENDANT'S SENTENCING MEMORANDUM**

> negative influences in their whole environment. . . . The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character. From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed. Indeed, "[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside."

*Roper*, 543 U.S. at 569-570 (internal citations omitted). Two years later, the Court, citing *Roper*, relied on the youth of the twenty-one-year-old defendant as one of the reasons justifying a below-guidelines sentence:

> In summary, the District Judge observed that all of Gall's criminal history "including the present offense, occurred when he was twenty-one-years old or younger" and appeared "to stem from his addictions to drugs and alcohol." *Id*., at 123. The District Judge appended a long footnote to his discussion of Gall's immaturity. The footnote includes an excerpt from our opinion in *Roper v. Simmons*, 543 U.S. 551, 569 (2005), which quotes a study stating that a lack of maturity and an undeveloped sense of responsibility are qualities that "'often result in impetuous and ill-considered actions.'" The District Judge clearly stated the relevance of these studies in the opening and closing sentences of the footnote:
>
> > Immaturity at the time of the offense conduct is not an inconsequential consideration. Recent studies on the development of the human brain conclude that human brain development may not become complete until the age of twenty-five. "[T]he recent [National Institute of Health] report confirms that there is no bold line demarcating at what age a person reaches full maturity. While age does not excuse behavior, a sentencing court should account for age when inquiring into the conduct of a defendant.

*Gall v. United States*, 552 U.S. 38 (2007); *see also United States v. Cabrera*, 567 F.Supp.2d 271, 279 (D. Mass. 2008) (granting downward variance and noting that the "Sentencing Commission's report, *'Recidivism and the 'First Offender'* . . . suggests that individuals – like Cabrera – with zero criminal history points are less likely to recidivate than all other offenders."). The same reasoning applies to the teenaged Mohamed who was far short of full maturation at the time of the offense.

**PAGE 14    DEFENDANT'S SENTENCING MEMORANDUM**

Immaturity, vulnerability, and malleable identity are all evident in this case, as Dr. Cauffman highlighted, and weigh strongly in favor of variance to a less severe sentence. Mohamed's immaturity, his struggle to define identity, and the strong likelihood that character deficiencies are being reformed as he ages all provide grounds to forgive him "for failing to escape negative influences" in his environment, as stated in *Roper*.

5.     **Mohamed's Involvement With Drugs And Alcohol During The Relevant Time Mitigates The Offense.**

During trial, the Court learned about Mohamed's drug and alcohol use in an abbreviated form. The Court has now received the drug and alcohol evaluation by a certified specialist. The eight-page report documents the drug and alcohol history that, during the last part of Mohamed's senior year of high school, began spiraling out of control and did not stop until just before his arrest. Upon leaving the constraints of home for the first time, it is not unusual for college students to experiment with drugs and alcohol and even engage in binge behavior. Mohamed's well documented history goes far beyond that level. During his freshman year, he drank alcohol and smoked marijuana to the point of blacking out; it was not unusual for him to vomit from over-consumption of drugs and alcohol.

The use of drugs and alcohol affected Mohamed's behavior and judgment. Despite his academic ambitions, his increased use of drugs and alcohol corresponded directly with his dropping academically from a 3.58 grade point average his first quarter to lower grades and eventual discontinuation of classes. His friends have commented on his enthusiastic participation in substance abuse during social events, which is thoroughly corroborated by the surveillance of his text messages and telephone calls. His use was at a peak immediately before he was prevented from

going to Alaska for the fishing job, which was described as the closest he had ever felt to being suicidal.

Mohamed's drug and alcohol use continued through the time he was dealing with the undercover operatives. Although he pretended to the operatives that he was devout and compliant, he continued to use and abuse substances. The portion of the phone and text messages provided to the defense reveals significant abuse shortly before and shortly after several of the meetings with the government operatives. Mohamed recognizes that his drug and alcohol use affected his thinking; he began feeling clearer and clearer in his thinking as his incarceration wore on. He is eager to participate in available treatment through the Bureau of Prisons and requests that the Court recommend participation in in-prison residential treatment. His readiness for treatment reflects well on his ability to return to the community and live a law-abiding life, and his substance use during the relevant time – which was well-known to the government – mitigates the offense based on his vulnerability.

6.    **Mohamed's Known Vulnerability To Manipulation Warrants A Lower Sentence.**

In the fall of 2009, the FBI characterized Mohamed as a "conflicted/manipulable kid." This correct evaluation provides strong mitigation under imperfect entrapment because Mohamed's vulnerability to being influenced is a factor considered under entrapment law. *United States v. Sandoval-Mendoza*, 472 F.3d 645, 656 (9th Cir. 2006). Here, Mohamed was tremendously vulnerable:

- Mohamed's youth made him more likely to be influenced by older persons conveying an aura of confidence, competence, and authority;

PAGE 16    DEFENDANT'S SENTENCING MEMORANDUM

- The divorce and fighting of Mohamed's parents led him to feel alienated from his family and more likely to look to other authority figures for approval;

- Mohamed was experiencing natural teenage angst and identity issues resulting from being black, foreign-born, and Muslim in a generally homogeneous white Christian society;

- Mohamed had gone overboard in the college party scene and was drinking and using drugs to a degree more than sufficient to affect his judgment;

- Mohamed's search for meaning and identity in his religion, which had been negatively influenced by the internet and other extremist propagandists, made him susceptible to appeals to showing religious commitment and fervor through inappropriate means.

The FBI knew of the vulnerability: the mosque elder told the FBI on December 10, 2009, that Mohamed was "looking for guidance" and that "he was easily influenced." RT at 396, 399. Mohamed's father told the FBI he was immature and liable to be misled; the surveillance officer said that he appeared "manipulable" (RT at1466). Throughout their investigation, the FBI had access to vast and highly personal information about Mohamed's thoughts and actions. They were able to see, hear, and read about his excessive substance abuse, family problems, loneliness, searching, and confusion.

In this context, the government agents used strong persuaders to encourage Mohamed along the path to the offense. They effectively used praise and flattery; appealed to religion and social justice; and kept the path leading to the offense so smooth that Mohamed commented on how miraculous it was. The personas of the undercover agents were custom adapted to appeal to Mohamed, mirroring aspects of his life. For example, Youssef portrayed himself as an experienced politician and warrior who had trained in engineering (as Mohamed was doing in school) and who had used drugs in his youth (as did Mohamed). Hussein portrayed himself as a gruff professional

**PAGE 17   DEFENDANT'S SENTENCING MEMORANDUM**

who would be Mohamed's mentor and guide.  At one point, Mohamed even told Youssef that he believed "he was like a son to Hussein"  RT at 728.  As more fully developed below, Mohamed's vulnerability constitutes strong mitigation under imperfect entrapment.

### 7.     Mohamed's Lack Of Capacity To Commit The Offense On His Own Warrants A Mitigated Sentence.

As reflected in the CIPA summary, the FBI repeatedly determined that Mohamed would not commit any terrorist conduct unless specifically directed by the undercover agents.  Exhibit F.  As stated in the presentence investigation report, "there is no evidence Mohamud had previously researched, planned, or intended to carry out a domestic attack" until the FBI "offered Mohamud the means and opportunity to become 'operational' within the United States."  Indeed, the full record in this case shows that Mohamed acted throughout at the direction of the agents who designed and constructed the fake explosive device.

Although not a separate trial defense, the inability to commit the offense on one's own demonstrates a greater involvement by the government in creating an offense.  As a matter of law, the capability, or wherewithal, to commit the crime is a relevant aspect of entrapment, *United States v. Poehlman*, 217 F.3d 692, 698 (9th Cir. 2000), and is, therefore, relevant to sentencing entrapment as mitigation.  Mohamed had not sought or obtained any training or resources in the use of explosives, nor even expressed interest in committing any offense in the United States prior to contact by the government operatives.  Mohamed had no knowledge about bombs, explosives, or domestic attacks and depended on the agents to tell him what to do, and relied on them to independently obtain the critical parts for the device and, then, to actually construct the would-be bomb.  He did not even have a driver's license.  The lack of capacity to commit the offense on his own provides a strong basis for a reduced sentence.

PAGE 18   DEFENDANT'S SENTENCING MEMORANDUM

8.      **Mohamed's Maturation And Efforts To Improve Himself While In Custody Favor A Lower Sentence.**

Mohamed's response to his arrest and difficult future has been amazingly positive. As the shock of his arrest wore off, and the enormity of what he had been involved with sank in, he quickly saw that what he did was indefensible and wrong and contrary to the values of his family, community, and religion. The words in the renunciation dated December 22, 2010, are his own: he sincerely apologizes to the community for what he did and renounces terrorist violence. This was no ploy for sympathy; he had thought long and hard on the arguments made on the extremists websites that he had been so devoted to and realized the corruption of Islamic values that underlay the arguments. He not only has said the right things, he has acted on his renunciation by meeting with FBI agents and prosecutors for four meetings extending over 12 hours during which he fully and truthfully provided answers to all questions posed to him. From early in our discussions with the government, Mohamed has communicated his willingness to provide effective anti-terrorism action: he has volunteered to work with the government to communicate his renunciation and critique of violent extremism to other Muslim youth.

Very early in our representation, Mohamed told us that he could not change the past, but he was determined to do what he could to make himself a better person. In his dealings with his defense team, corrections officers, and other inmates, he has been courteous, kind, and compassionate. In some ways, the adolescent problems that made him so vulnerable to the undercover agents have been ameliorated by his pretrial detention. The breakup of his parents was devastating to him; his parents are now spending much time together, often visiting him together, and getting along better than they have for years. For his freshman year at college and the beginning of his sophomore year, Mohamed was binge drinking and using drugs; he now is happy to have a clear and unaltered mind. And he

PAGE 19   DEFENDANT'S SENTENCING MEMORANDUM

is using his mind constructively, as elaborated in the section on departure for post-offense rehabilitation, reading more than 200 books in the past two-and-a-half years. Our conversations regarding his reading reflect his turn away from rigid thinking and his embrace of critical thinking. He is thinking seriously about what it means to be a good person and understanding the perspective of others. When he thinks about his future, he wants to develop his skills so, while in prison and after, he will be in a position to help others.

Dr. Kinzie's continual visits with Mohamed confirm the assessment set out above. He sees maturation in Mohamed and a better understanding of his relationship with his religion. The manner in which Mohamed has adjusted is indicative of his positive traits and mitigates the need for specific deterrences.

**B.    The Nature And Circumstances Of The Offense Warrant A Substantially Mitigated Sentence (18 U.S.C. § 3553(a)(1)).**

The unique nature of the government's involvement with Mohamed prior to the offense calls for a mitigated sentence based on imperfect entrapment.

**1.    While Not A Complete Defense, Imperfect Entrapment Warrants A Mitigated Sentence Untethered To The Guidelines.**

The jury has resolved the question of guilt and innocence under the law of entrapment. This decision is a necessary predicate for the Court's consideration of imperfect entrapment in sentencing Mohamed. Under Ninth Circuit precedent, following a guilty verdict, the Court is to consider whether imperfect entrapment provides mitigation that was not considered by the Sentencing Commission. *United States v. McClelland*, 72 F.3d 717, 725-26 (9th Cir. 1995). This constitutes an "encouraged" ground for departure from the Guidelines under the reasoning of *Koon v. United States*, 518 U.S. 81, 94-95 (1996) (encouraged factors – such as imperfect self defense – were not

considered in the formulation of the Guidelines). The unique facts relating to entrapment in the present case, although not a complete defense, provide strong bases for rejecting the Guidelines and imposing a heavily mitigated sentence based on departure and under 18 U.S.C. § 3553(a)(1)'s consideration of the nature and circumstances of the offense.

Under the pre-*Booker* guidelines system, imperfect entrapment provided grounds for a downward departure based on facts relevant to entrapment that were insufficient to support acquittal. *McClelland*, *supra*; *United States v. Garza-Juarez*, 992 F.2d 896, 912 (9th Cir. 1993) (departure available "when government agents used persuasion alone," even though the agents' conduct "'did not constitute entrapment in a legal sense'" (quoting *United States v. Takai*, 941 F.2d 738, 744 (9th Cir. 1991))). Under Ninth Circuit law, the imperfect entrapment departure ground appears to require that the defendant take the case to trial. *McClelland*, 72 F.3d at 724-26.

Evidence of imperfect entrapment provides strong grounds for a mitigated Guidelines range in applying the Supreme Court's post-*Booker* variance regime under 18 U.S.C. § 3553(a). *See Gall*, 552 U.S. at 49 (requiring calculation of the appropriate Guidelines range as "the starting point and the initial benchmark" before reaching the final sentence); *accord United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc). The Court should reach a substantially reduced sentencing range based on imperfect entrapment under the Guidelines before considering the substantial mitigation based on factors such as Mohamed's over-representative criminal history, post-offense rehabilitation, and cooperation.

### 2. Prior To Government Contact, Mohamed Did Not Plan Or Prepare A Terrorist Act In The United States.

Throughout the trial, a number of witnesses testified that, despite blanket surveillance of every email, phone call, text message, and computer activity, there is no evidence that prior to the

PAGE 21   DEFENDANT'S SENTENCING MEMORANDUM

direct government contact, Mohamed took any steps to research, plan, or otherwise prepare to commit a terrorist act in the United States. Special Agent Trousas, the case agent responsible for the undercover operation, testified that there was no evidence that Mohamed attempted to obtain any explosives, any bomb components, or that he even sought any information about how to construct a bomb prior to contact with the undercover operatives. RT at 483. SA Trousas further testified that, based on the electronic and physical surveillance, there was no evidence that Mohamed had ever communicated interest in building a bomb, suggested bombing people or property in Portland, or had any plans to use a weapon of mass destruction prior to being contacted by the undercover operatives. RT at 483-84. SA Trousas's assessment of the evidence was confirmed by the original case agent, Bill Smith's handler, and the current case agent. RT at 1461 (SA Delong); RT at 1543, 1569 (SA Dodd); RT at 1718, 1757, 1771 (SA Dwyer).

Although apparently not privy to the surveillance evidence, the undercover operatives reached similar conclusions about Mohamed based on their interactions with him. Youssef testified that Mohamed knew nothing about explosives and did not seem to have any interest in bombs until "later on in the operation." RT at 732. Likewise, Hussein concluded that Mohamed was not capable of carrying out the purported plot on his own and "never did" have any idea about how to construct a bomb. RT at 955, 990. As of August 19, 2010, Hussein did not believe that Mohamed was "going to go and put a bomb together and do something with his own." RT at 964-65. The Bill Smith email solicitations, although inflammatory, did not induce Mohamed to take any bad actions. As the FBI emails indicate, the internet activity relating to extremism dropped off sharply at college, while his communications about partying increased during the school year, before he first met the agents.

**PAGE 22   DEFENDANT'S SENTENCING MEMORANDUM**

Even leading up to the first unrecorded meeting with undercover agent Youssef, Mohamed did not think he was becoming involved with unlawful activity. We know this because he proposed meeting Youssef publicly at the mosque, not surreptitiously as one would for something illegal. Also, because the name "Youssef" coincidentally belonged to an extremist propagandist, Mohamed believed he was meeting with someone who was interested in his writing, who is named in the proffer. The voice mail of Youssef's message of July 30, 2010, even records Mohamed saying he knew "this guy." Of course, Mohamed was wrong, but it demonstrates that, until he met Youssef, he was not planning on taking action. When pressed to say when he first thought of Pioneer Square, Mohamed responded to the undercover agents, "Since I seen you and, and you know we had a talk before." RT at 940.

Again, the jury has decided the question of criminal liability, which forms the basis for imposition of a sentence. However, the length of that sentence appropriately considers that, until the face-to-face meeting with Youssef, Mohamed had not been taking any action to commit the offense for which he is now being sentenced.

3. **At Worst, Mohamed's Inchoate Interest In Helping Others Abroad Would Be Punishable As Attempted Material Support, With A Fifteen Year Maximum Sentence.**

Although an offense occurred, imperfect entrapment should result in general rejection of the Guidelines, both for the offense and for the adjustment. The Guidelines are not very useful in the context of imperfect entrapment because, as Judge Posner indicated in a stash house robbery sting, the societal and future risks are completely different when dealing with government sponsored criminal activity, regardless of whether the government activity constitutes a defense. *See United States v. Kindle*, 698 F.3d 401, 414-16 (7th Cir. 2012) (in imperfect entrapment case, five years

imprisonment "more than adequate" rather than 27 year Guideline sentence) (Posner, J., concurring and dissenting), *vacated pending en banc review*.  To the extent any Guideline is useful, the fifteen year statutory maximum for material support, which would also be the Guidelines sentence under U.S.S.G. § 5G1.1(a), provides the apt analogy for a starting point from which further reductions for other grounds for variance and cooperation are appropriate.  The starting point should be far lower than the Guidelines given the extraordinary circumstances of this case.

4.      **The Social Psychology Dynamics Of Conformity And Compliance With Authority During The Offense Provide Bases For A Mitigated Sentence.**

Both Dr. Sageman and Professor Moghaddam testified regarding the huge pool of potential individuals with grievances who could be manipulated into sympathy and action on behalf of our enemies.  RT at 2245-46, 2438-39.  In examining the extremely small number of persons who actually take terrorist action, especially in the context of suicidal action, social psychology has several counterintuitive insights that are important for assessing the offense conduct of the individual in the context of government encouragement.

We contacted Professor Moghaddam based on his book *From The Terrorists' Point Of View*, in which he tied the recruitment of suicide bombers to the dynamics of conformity and authority exemplified in the famous experiments of Professors Milgram and Zimbardo.  The powerful social psychological influences that Professor Moghaddam described were very similar to the ones the undercover agents applied to Mohamed (regardless of whether the use of the techniques was deliberate or not).  While these social psychological influences do not excuse Mohamed's behavior, they provide important background information for sentencing purposes in helping to explain Mohamed's conduct, assessing imperfect entrapment, and ameliorating concerns regarding future dangerousness.

PAGE 24    DEFENDANT'S SENTENCING MEMORANDUM

In the Milgram experiment, the professor took normal individuals and placed them in a social context where a white-coated authority figure instructed the individual to participate in a learning exercise: the individual supposedly administered shocks to a "learner" when the learner made errors. The learner was in fact an actor who faked pain from gradually increasing shocks. Although both experts and lay people predicted very few individuals would administer shocks to the point of endangering the learner's life, over 60 per cent did so. RT at 2215-17. Although the experiments took place in the 1970s, and ethical considerations for the subjects has curtailed similar experiments, the results have been replicated with consistent results between 60 and 80 per cent. Jerry M. Bruger, *Replicating Milgram*, AM. PSYCHOLOGIST at 1-2, 9-10 (2009). Interestingly, the Milgram experiments included in their design the learner faking painful responses because, in earlier formulations of the experiments, where subjects did not see the immediate repercussions of their electric shocks, compliance was almost 100 per cent. Nestar John Charles Russell, *Milgram's obedience to authority experiments: Origins and early evolution*, BRIT. J. SOC. PSYCHOL. at 19-20 (2010).

The power of social context was also demonstrated by the Stanford prison experiments of Professor Zimbardo. He created an artificial construct of normal individuals who were randomly assigned roles as prisoners and prison guards. The experiment broke down after several days because the power of the situation was creating dangerous and upsetting conflicts. Once the roles were accepted, the participants adopted attitudes and actions inconsistent with their behavioral norms, including harsh language and physical abuse. RT at 2214-15.

As Professor Moghaddam testified, the social psychology of the interactions between the agents and Mohamed strongly supported staying the course toward committing the bad act. RT at

**PAGE 25   DEFENDANT'S SENTENCING MEMORANDUM**

2219-40.  The structural context reinforced the distorted world view Mohamed had been receiving from the internet.  Both agents assumed roles of authority and leadership figures and acted with confidence and assurance that their acts were the will of God and served justifiable social justice ends for oppressed co-religionists.  Throughout the recordings, the agents praise and flatter Mohamed as a "gem," a "talent," and a great poet.  From the first meeting, the agents isolated Mohamed, requiring secrecy and even getting him to move out on his roommates.  Even before that, with the Bill Smith emails, the agents normalized the idea of bringing the fight to America and the need for actions rather than mere words to stop the killing of Muslim women and children.

Three defense experts also discussed the nature of the directions given by the agents to Mohamed.  They analyzed the record of the taped communications, pointing out the repeated directions and control of the situation.  Dr. Sageman's testimony as a terrorism expert paralleled Professor Moghaddam's testimony regarding social context.  He added his analysis of the relationship between FBI sting operations and acts of terror.  RT at 2450-51.

The government expert's testimony also supports a mitigated sentence.  He acknowledged that many thousands, and in some instances millions, of people view and visit some of the websites at issue in this case.  What he did not know or analyze was how government actions in a sting affect the behavior of those people, about which Dr. Sageman was able to opine.  *Compare* RT at 2129 *with* RT at 2447, 2450-51.

As Professor Moghaddam wrote in his book, the social science "does not negate the idea that human beings enjoy some measure of free will and can intentionally choose between different courses of action."  But Professor Moghaddam's testimony about social psychology is relevant to sentencing: the powerful force of context to push individuals to go along with an authority figure;

the power of context to lead individuals to choose to conform to a deviant group-established norm; and the "fundamental attribution error" that behavior does not necessarily indicate an innate trait but can be explained by powerful social dynamics. In other words, the disconnect between Mohamed's good behavior growing up and excellent efforts at rehabilitation outside the construct of the plot can be explained at least in part by the social psychology created by the government's efforts to assess what he would do. These government influences both mitigate the offense and provide a strong basis for confidence in the assessment that Mohamed poses a very low risk of future dangerousness.

### 5. Tactical Choices Regarding The Offense Are Relevant To Sentencing Entrapment.

Under the imperfect entrapment defense – as an aspect of the nature and circumstances of the offense – the Court should also consider tactical choices that contributed to the scope of the offense. For example, the FBI determined in early emails that Mohamed could be arrested for drug offenses, then either turned into an informant or simply neutralized by supervision within the criminal justice system. CR 386-1, 386-2. Alternatively, given that Mohamed's interest – and the FBI's concern – related to overseas activity, the case could have been steered toward a material support charge with a fifteen year maximum sentence under 18 U.S.C. § 2339A, rather than the offense charged.

Once the idea of an explosion was discussed on tape, the agents directed their activities toward continuing and carrying out the plan. As undercover agent Youssef testified, the agents kept providing directions and tasks "to be sure Mohamed stays on course and follows the plan that he came up with." RT at 778. This included the agents' coordinated effort to discourage suicide while encouraging actions that would keep him alive and feeling important. The government also made the tactical decision to maximize the public effect of the incident; instead of arresting him after

PAGE 27   DEFENDANT'S SENTENCING MEMORANDUM

taking a substantial step toward completion of the offense, the government allowed the conduct to go up toward completion, then conducted an arrest with full publicity and civic alarm.  While Mohamed agreed, the choices the government made are relevant mitigation.

> **6.**      **Without Government Involvement, The Bomb Plot Would Never Have Occurred.**

An aspect of sentencing unique to this case is the conjectural risk the sting addressed.  We cannot know the future.  We do not know what would have happened if Mohamed had been left alone or had been influenced in a positive direction.  Only in science fiction is pre-crime detected, as in the short story and film *Minority Report*.  Our world includes no certainties regarding time, with its "million'd accidents creep in," *United States v. Todd*, 627 F.3d 329, 334 (9th Cir. 2010), which "blunt the sharp'st intents, Divert strong minds to the course of altering things" (quoting Shakespeare, Sonnet CXV).  The repeated evaluations of FBI agents who surveilled Mohamed during the fall of 2009 described him as conflicted and decreasing his internet involvement with extremism.

The Court can conclude that, while a risk existed, there are substantial indicators that, in the absence of government prodding, there is a reasonable likelihood that any one of a number of more favorable scenarios could have occurred.  Counter-terrorism expert Dr. Marc Sageman testified that there is no history or precedent in real life for the type of recruitment in which the undercover operatives engaged.

> [I]n not a single case where a foreign terrorist organization was involved, in all – since 2001, has there been a single recruiter or spotter and assessor, al-Qaeda spotter and assessor in the West.  That does not exist.  I haven't seen that.  I've looked for it.

RT at 2505; *see also* 2450-51.  Mohamed likely would have grown out of his radical phase with greater maturity and the positive influences of college life.  He would have had the favorable influence of the roommate he abandoned at the direction of the operatives, Mohammad Mohamed.

Mohamed could have fallen in love or committed himself to constructive campus organizations.  He likely would have reconciled with his parents, as he has done now.  The death of Bin Laden and the Arab Spring contribute to the likelihood that his high school extremism would have continued to fade as Mohamed transitioned to adulthood.  The likelihood that the government's action influenced the outcome is precisely why imperfect entrapment is to be considered in sentencing.  The extent to which a defendant's conduct was influenced by the government mitigates the sentence that should be imposed.

**C.    The Goals of Sentencing Would Be Served By A Sentence Not Greater Than Ten Years (18 U.S.C. § 3553(a)(2)).**

The general needs for sentences to incarceration apply in this case, but the particular facts warrant a substantially mitigated term of imprisonment.

**1.    The Seriousness of The Offense Requires A Period Of Incarceration (18 U.S.C. § 3553(a)(2)(A)).**

Mohamed is deeply ashamed every time we review discovery, or he sees trial testimony, about what he said and did leading up to November 26, 2010.  The crime he attempted was horrific.  Regardless of the role of government actors, he will always live with what he did and what he deluded himself into thinking was right and justified.  Because of the seriousness of the offense, the defense requests that the Court impose a substantial period of incarceration – recognizing that the requested sentence constitutes over half of the time he had been alive at the time of the offense.  In assessing the seriousness of the offense as a sentencing factor, the Court can and should consider that

PAGE 29   DEFENDANT'S SENTENCING MEMORANDUM

this particular offense was an elaborately supported thought crime:  no person was killed, hurt, or endangered.

> **2.      The Requested Sentence Provides Adequate General Deterrence To Criminal Conduct, While Recognizing That The Parents' Involvement In Calling The FBI Calls For A Reduced Sentence (18 U.S.C. § 3553(a)(2)(B)).**

The substantial requested term of imprisonment for a young first-time offender provides adequate general deterrence.  There is, however, another component of deterrence in the context of this case: the danger that community members – especially Muslims – will learn to fear cooperating with authorities and thereby create greater national security dangers.  Osman and Mariam made the fateful decision on August 31, 2009, to call the FBI and report their concerns about their son.  The parents did exactly what we would want anyone in that position to do.  They asked for help – they cannot be blamed for thinking that their government did not provide the type of help they sought.

Osman and Mariam have endured inexpressible pain since discovering that their phone call ultimately led to the sting operation against their son.  As Osman told the FBI when he first met with them, he loves America – "God bless America" – and he had faith the government would treat his family right.  RT at 2149.  The path taken cannot be taken back, but the Court, in assessing general deterrence, can provide a large measure of mitigation by considering, as a separate basis for a substantial sentence reduction, that a mitigated sentence based on the parents' actions will provide some reassurance – or at least less deterrence – to community members who contemplate communicating with the government regarding their concerns about other community members or loved ones.

3.     **Psychiatric Evidence Demonstrates That Mohamed Presents A Low Risk To The Public For Future Crimes (18 U.S.C. § 3553(a)(2)(C)).**

The Court has the reports of two extremely well-qualified experts who, based on extensive interviews and background information, conclude that Mohamed presents a low risk of future dangerousness. Dr. Kinzie is a professor at Oregon Health Sciences University with over 40 years of experience as a psychiatrist. He interviewed Mohamed eleven times from shortly after his arrest until shortly after the trial, each time for about an hour. He closely reviewed the psychological testing from Dr. Grounds as well as the drug and alcohol assessment. He concludes that Mohamed presents a low risk of future dangerousness:

> There are a number of psychological factors that mitigate the degree of potential for danger in the future. One is the presence or absence of personality disorders or mental illness. Again, my impression is that there is no evidence of antisocial personality disorder or other mental illness that would indicate violent or dangerous behavior. He displayed no anger, irritability or aggression toward any persons in the eleven sessions. Despite the nature of his charge, there is no other indication of future dangerousness from a psychiatric point of view. He articulates a sincere rejection of violence while also taking concrete steps to distance himself from extremism by both assisting the government and becoming closer with his parents. He states that he felt he had to harden himself in a bad way to commit the offense and is relieved to express apology and remorse. His history of appropriate values and behavior prior to his radicalization, combined with the shame for accepting criminal violence, make future involvement in this type of behavior highly unlikely.

Exhibit G at 4. Dr. Kinzie's assessment is firmly planted in the full context of the offense:

> In reviewing the offense conduct, I was struck by the degree to which the government's actions would influence someone with Mr. Mohamud's vulnerabilities. For someone searching for identity, the characters created by the agents provided compelling affirmations and answers that would encourage the negative influences on Mr. Mohamud from his internet and other contacts. Mr. Mohamud was adrift and looking for guidance. His conflicts and confusion were exacerbated by drugs and alcohol, which not only affected his judgment but triggered a significant cultural taboo that compounded his identity issues. As a psychiatrist, I have treated young people addressing complex identity issues and provided guidance that helped them safely through the maturation process. The testimony of his friends and relatives is

PAGE 31   DEFENDANT'S SENTENCING MEMORANDUM

consistent with what I saw and reinforces my assessment of his low risk of future dangerousness.

Exhibit G at 3-4. Dr. Kinzie also strongly supports the recommended treatment for alcohol and drug dependency, both through the in-prison available programming and with conditions of supervised release.

Dr. Kinzie's evaluation is consistent with Dr. Sageman's. Dr. Sageman is a leading counter-terrorism expert who has worked for New York City, federal national security agencies, and the United States Army evaluating future dangerousness of persons suspected as potential terrorists. He testified extensively at trial regarding the large universe of disaffected Muslims who could be susceptible to extremist actions. In addition to his assessment of predisposition for trial, Dr. Sageman, who is also a forensic psychiatrist, analyzed Mohamed during about seven hours of interviews and has interviewed both of Mohamed's parents on the question of dangerousness.

Dr. Sageman states that Mohamed fully recognizes that what he did was wrong:

> During my interview with him, Mr. Mohamud said that he had given up on his extremist views and ideas. The time in jail has allowed him to read, deepen his understanding of his religion and its true meaning, and he has learned that he was wrong to interpret his religion in such an extremist way. He was very sorry about what had happened and specifically his role in the plot.

Exhibit H at 2. Consistently with the psychological testing and Dr. Kinzie's observations, Dr. Sageman concludes that Mohamed does not present a dangerous psychological profile:

> In terms of his mental health, Mr. Mohamud displayed no signs or symptoms of any mental disorder. He was doing well, given his environment, and was trying to make sense of what had happened to him. He had good insight into his situation and was very remorseful about his past behavior. He had no symptoms of any personality disorder and no sign of psychopathy. Prior to his arrest, he had no history of any violent behavior.

PAGE 32   DEFENDANT'S SENTENCING MEMORANDUM

Exhibit H at 2. Dr. Sageman's evaluation is that Mohamed is "at very low risk of being dangerous in the future, both in the criminal and political sense":

> In terms of future dangerousness, Mr. Mohamud had no past history of personal violence. Therefore, there is no indication of future criminal violence as he displays no risk factors for such violence. In terms of potential for future political violence, he has given up his extremist ideology. During the interview, and from observations of his parents and the correctional facility staff, he seems transparent and heartfelt. His remorse at what he has done seems sincere. He has matured during his detention and understands what he did wrong through his readings now that he had time to examine the error of his past ideas. The very short literature on terrorist recidivism shows that the potential for violence is directly related to maintaining extremist ideas. Mr. Mohamud's case is unique as he has completely given up his extremist ideology and he understands where he went wrong. Therefore, he is no longer susceptible to any temptation to join-a violent group. He is at very low risk of being dangerous in the future, both in the criminal and political sense.

Exhibit H at 2. The psychiatric evidence strongly supports the lay evidence that shows Mohamed, notwithstanding the offense of conviction, presents an unusually low level of risk of future dangerousness.

4.      **The Most Effective Manner Of Providing Mohamed With Needed Training And Treatment Is To Permit Release To Community Corrections As Soon As Possible (18 U.S.C. § 3553(a)(2)(D)).**

As reflected in his conduct in pretrial custody and in the alcohol and drug assessment, Mohamed is an eager learner who wants to take advantage of any training and treatment while incarcerated. Federal prison does not offer the kind of correctional opportunities that would be most effective. Mohamed will make the most of his time in custody, but this factor largely militates in favor of release to community corrections at the soonest possible time to allow for access to appropriate education, training, and other community resources.

**PAGE 33    DEFENDANT'S SENTENCING MEMORANDUM**

**D.    The Harsh Types Of Custody Mohamed Will Likely Endure Favor A Shorter Period Of Incarceration (18 U.S.C. § 3553(a)(3)).**

The kinds of imprisonment available in this case favors a mitigated sentence. As stated in the presentence report, Mohamed has done well at each level of custody in pretrial detention at the Multnomah County Detention Center. He has been living for the past 17 months on a normal dorm unit and has acted as an honorary trustee at times. He has demonstrated that he does not require heavy security in order for him and others to be safe. Nonetheless, the kind of imprisonment Mohamed is facing is harsh, punitive, and much more oppressive than necessary. The Bureau of Prisons routinely places persons with terror-related charges with long sentences in the most restrictive and least treatment-oriented facilities. Not only are there onerous restrictions, prisoners in communication management units are severely restricted in their contacts with family.

This type of custody is utterly unnecessary but may be inevitable for Mohamed. There should be no question Mohamed will be a compliant and positive inmate wherever he is imprisoned. He should be encouraged to maintain his relationship with his family to the maximum extent possible. At Multnomah County Detention Center, he has been seeing his father and mother on almost a weekly basis and is able to have regular telephone contact. The Court should include in the judgment and commitment order the strongest recommendation that the BOP encourage contact and communication with his family and allow Mohamed to serve his sentence in a medium security facility as close as possible to his home. Recognizing that the strong likelihood is that he will serve a substantial portion of the sentence in unnecessarily restrictive circumstances, the Court should consider this factor as a reason for reducing the sentence imposed.

PAGE 34   DEFENDANT'S SENTENCING MEMORANDUM

E.      **The Guidelines Do Not Anticipate Cases Of Imperfect Entrapment Or Other Grounds That Favor A Mitigated Sentence (18 U.S.C. § 3553(a)(4)).**

The Guidelines provide little basis for useful guidance regarding sentencing in this case, given the panoply of unique circumstances surrounding the defendant and the offense. As discussed, the encouraged departure ground of imperfect entrapment favors dispensing with the Guidelines altogether. *Supra* at 20-29. To the extent any Guideline is useful as a starting point, the material support statutory maximum serves that purpose. Again, the imperfect entrapment mitigation assumes criminal responsibility for the conduct. The very active government involvement in the offense, as well as the relative absence of defendant-generated initiatives, take this offense far out of the mainstream assumptions underlying the Guidelines.

Further, other departure grounds such as over-representative criminal history and post-offense rehabilitation, as well as acceptance of responsibility, favor a mitigated sentence.

1.      **Departure Based On Over-Representative Criminal History Under U.S.S.G. § 4A1.3.**

The Guidelines on criminal history provide a strong basis for a lateral departure based on an over-representative criminal history. Under the Guidelines, the terrorism enhancement artificially and automatically raises Mohamed's criminal history to a category VI level. U.S.S.G. § 3A1.4(b).

Under U.S.S.G. § 4A1.3(b)(1), "If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted." No limitations on downward departures apply in this case. U.S.S.G. § 4A1.3(b)(3). Courts have relied on § 4A1.3 to mitigate the harsh and indiscriminate application of a category VI designation in terrorism related cases. *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003) ("A

**PAGE 35   DEFENDANT'S SENTENCING MEMORANDUM**

judge determining that [the terrorism enhancement] over-represents 'the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes' always has the discretion under § 4A1.3 to depart downward in sentencing."); *United States v. Thurston*, CR 06-60069-01-AA, 2007 WL 1500176, *18 (D. Or. May 21, 2007) (Aiken, C.J.) (unpublished) ("[E]ven if [the terrorism enhancement] is deemed to apply and raises the defendants' criminal history category to VI, the court retains discretion to depart downward . . . under U.S.S.G. § 4A1.3."); *see also United States v. Benkahla*, 501 F.Supp.2d 748, 759 (E.D. Va. 2007) (in terrorism case, court found a criminal history category of VI over-represented defendant's criminal history and the likelihood of recidivism and departed under § 4A1.3 to a criminal history category of I); *United States v. Aref*, No. 04-CR-402, 2007 WL 804814, *2-3 (N.D.N.Y. Mar. 14, 2007) (unpublished) (same). The evidence before the Court establishes that treating this first offender as having the worst of criminal histories over-represents both the seriousness of his criminal history and the likelihood he will commit new crimes.

The Court should reject the guidelines shift to criminal history category VI for a separate reason. U.S.S.G. § 3A1.4 uses the nature of the offense conduct to radically increase the criminal history score. This is inconsistent with the entire structure of the Guidelines, which is based on a two-part grid – one that focuses on the nature of the offense, the other that focuses on criminal history. *See Koon v. United States*, 518 U.S. 81, 88 (1996) ("Under the Sentencing Guidelines, a district court identifies the base offense level assigned to the crime in question, adjusts the level as the Guidelines instruct, and determines the defendant's criminal history category"); *United States v. Alessandroni*, 982 F.2d 419, 421 (10th Cir. 1992) (the structure of the Guidelines suggests that the criminal history category is determined independently of the offense level and without regard to

the nature of the crime for which the defendant is currently being sentenced). The terrorism guideline improperly conflates the two. In doing so, it is inconsistent with the underlying principles of the Guidelines and should not be followed. *Compare* 28 U.S.C. § 994(c) *with* 28 U.S.C. § 994(d)(10).

This Court should follow the lead of other courts that have rejected application of other guideline sections because they are not rationally based. *See Spears v. United States*, 555 U.S. 261, 266 (2009) (courts are allowed to disagree with the Sentencing Guidelines for crack-cocaine based on policy disagreements); *United States v. Henderson*, 649 F.3d 955, 960 (9th Cir. 2011) (following the reasoning of *Spears*, courts may categorically disagree with the sentencing guidelines when it is clear that the Guidelines for a particular offense do not exemplify the Commission's "exercise of its characteristic institutional role").

The Sentencing Commission justified its addition of the terrorism guideline by reference to congressional action in 1996. *See* U.S.S.G. § 3A1.4, cmt. 4. Review of the Guideline amendments and the statutes to which they refer reveal, however, that Congress did not direct the Commission to shift the criminal history score for terrorism offenses. The 1995 amendment 526 referred to the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103–322, § 120004, 108 Stat. 1796, 2022 (1994). That statute only directed the Sentencing Commission to "amend its sentencing guidelines to provide an appropriate enhancement for any felony . . . that involves . . . terrorism." It did not direct the sentencing commission to increase a defendant's criminal history to category VI. The 1996 amendment 539 referred to the Anti-Terrorism and Effective Death Penalty Act, Pub. L. No. 104-132, § 730, 110 Stat. 1214, 1303 (1996) (AEDPA). That statute ordered the Sentencing Commission to amend U.S.S.G. § 3A1.4 to remove the term "international" from the chapter, so that

**PAGE 37   DEFENDANT'S SENTENCING MEMORANDUM**

the adjustment applied to all federal acts of terror. It did not order the Sentencing Commission to increase a defendant's sentence through raising the defendant's criminal history. The 1997 amendment 565 similarly referred to AEDPA § 730 and the change from "international terrorism" to "terrorism" in general and does not mention criminal history. The 2002 amendment 637 again referred to AEDPA § 730 and provides an Application Note explaining the Upward Departure Provision of U.S.S.G. § 3A1.4. It does not provide any reasoning for merging criminal history and the nature of the offense.

Mr. Mohamud had zero criminal history points and was therefore in Criminal History Category I at the time of his arrest. The sentencing range achieved by using Criminal History Category I properly reflects the criminal history that the Guidelines are structured to consider independently from the offense. There is no basis for a finding that Criminal History Category I under-represents the seriousness of Mohamed's criminal history or risk of future dangerousness under U.S.S.G. § 4A1.3.

> **2.    Departure And Variance For Post-Offense Rehabilitation Under *Pepper v. United States*.**

In addition to his renunciation and proffers, Mohamed has engaged in a unique and effective form of reading and thinking during the extended time of pretrial custody. As reflected in the attached reading list, he has been reading an impressive range of literature, from the great books to self-improvement books to popular culture. Exhibit I. And he has been thinking deeply about issues raised in his readings and relating them to how to be the best person and citizen that he can be.

When we first met Mohamed, we made a point of seeing him frequently both to keep him informed of legal developments and to address concerns that he would be in despair and perhaps suicidal. As we spent more time with him, it became more and more clear that, having had the

PAGE 38   DEFENDANT'S SENTENCING MEMORANDUM

bubble of the plot construct burst, Mohamed had no commitment to or sympathy for the type of violence he had embraced. He expressed disbelief that he could have intellectualized the horrible reality of violence against innocents as justifiable, that he could have thought something was spectacular that was so horrible. He felt deep shame for his acts and his failure to follow his parents' expectations.

Mohamed's letter of apology to the community on December 22, 2010, provided an important step in accepting responsibility for his conduct and doing what he could to atone for his acts. It was also an important psychological and emotional step: we could see in his demeanor that he felt relief acknowledging the wrong he had done and determining that he would dedicate himself to a better future. We discussed how, during his pretrial time in custody, he had the opportunity to develop himself as a critical thinker and increase his base of knowledge to assure that he could never be misled into doing such wrong things again. We identified his black and white thinking and uncritical acceptance of things he read on the internet as sources of his problems. With our encouragement, Mohamed enthusiastically embarked on an exploration of books, many by authors who wrote regarding matters he connected to his life experiences, including his offense.

For the past 31 months, undersigned counsel has met with Mohamed just about every week. While there is much to discuss regarding the case, we have frequently also discussed the books he is reading and relating literature to his life. Several examples come to mind. Reading Kurt Vonnegut's fiction based in World War II, Mohamed connected the glorification of violence on the internet with the bleak reality of war's horrors. In discussing Jean-Dominique Bauby's life as being a completely paralyzed writer who could only communicate with eye-blinks, Mohamed saw the heroism of someone so confined, while also seeing that his own life's challenges – including long

confinement in prison – were manageable in comparison.  In reading Victor Frankl on surviving the Nazi concentration camps, Mohamed saw the importance of maintaining and developing his humanity, especially in relation to helping his fellow prisoners when he could.  In reading Solzhenitsyn, Mohamed took from him the insight that the jihadist ideology had the common dangers of the ideologies of colonialism, Naziism, and communism that have led to so much suffering.

In short, Mohamed has taken very seriously the mission of educating himself to make himself a better person and to be able to assure the Court that he is committed to a law-abiding and thoughtful life.  We have often discussed the old adage that the more you learn, the less you know.  Certainty allowed Mohamed to embrace extremism as a teenager; now when he reads his old writings and when he hears his showing off for the agents, he cringes.  He knows more and questions more, especially about the kinds of certainties that rationalize violence.  From a time when he obeyed his father but felt great conflict with him, Mohamed now sees more and more of his father's admirable traits of helping others, tolerance, and dedication to work and family.

Penitentiaries have their origin in the purpose of requiring inmates to look inward and to be repentant for their crimes.  That is exactly what Mohamed has done.  He has looked at his conduct and hates what he saw.  He is doing everything he can to make himself a better person and to have the tools to be able to be constructive in society, to help others.  He hopes to be able to provide medical assistance to others while serving his sentence and to continue learning so that when he emerges into society, he will have something to offer to maintain himself, to help his family, and to assist others.

**PAGE 40   DEFENDANT'S SENTENCING MEMORANDUM**

Post-offense rehabilitation has been recognized by the Supreme Court as an appropriate ground for a downward variance. *United States v. Pepper*, 131 S.Ct. 1229 (2011). The starting point of the *Pepper* analysis carries great weight in the present case: "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." 131 S.Ct. at 1239-40 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). "[T]he punishment should fit the offender and not merely the crime." *Pepper*, 131 S.Ct. at 1240 (citations omitted). In this context, rehabilitative efforts inform a number of sentencing factors:

> [E]vidence of postsentencing rehabilitation may be highly relevant to several of the § 3553(a) factors that Congress has expressly instructed district courts to consider at sentencing. For example, evidence of postsentencing rehabilitation may plainly be relevant to "the history and characteristics of the defendant." § 3553(a)(1). Such evidence may also be pertinent to "the need for the sentence imposed" to serve the general purposes of sentencing set forth in § 3553(a)(2)—in particular, to "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant," and "provide the defendant with needed educational or vocational training . . . or other correctional treatment in the most effective manner." §§ 3553(a)(2)(B)-(D). Postsentencing rehabilitation may also critically inform a sentencing judge's overarching duty under § 3553(a) to "impose a sentence sufficient, but not greater than necessary" to comply with the sentencing purposes set forth in § 3553(a)(2).

*Pepper*, 131 S.Ct. at 1242 (citation omitted). Rehabilitation as a measure of likely future conduct is critical:

> Pepper's postsentencing conduct also sheds light on the likelihood that he will engage in future criminal conduct, a central factor that district courts must assess when imposing sentence. *See* §§ 3553(a)(2)(B)-(C); *Gall*, 552 U.S., at 59, 128 S.Ct. 586 ("Gall's self-motivated rehabilitation . . . lends strong support to the conclusion that imprisonment was not necessary to deter Gall from engaging in future criminal conduct or to protect the public from his future criminal acts" (citing §§ 3553(a)(2)(B)-(C))). As recognized by Pepper's probation officer, Pepper's steady employment, as well as his successful completion of a 500–hour drug

PAGE 41   DEFENDANT'S SENTENCING MEMORANDUM

treatment program and his drug-free condition, also suggest a diminished need for "educational or vocational training . . . or other correctional treatment." § 3553(a)(2)(D). Finally, Pepper's exemplary postsentencing conduct may be taken as the most accurate indicator of "his present purposes and tendencies and significantly to suggest the period of restraint and the kind of discipline that ought to be imposed upon him." *Ashe*, 302 U.S. at 55, 58 S.Ct. 59. Accordingly, evidence of Pepper's postsentencing rehabilitation bears directly on the District Court's overarching duty to "impose a sentence sufficient, but not greater than necessary" to serve the purposes of sentencing. § 3553(a).

*Id*. at 1242-43. Mohamed's devotion to atonement and self-improvement provides the Court with a well-recognized basis for a substantially reduced sentence.

### 3.    Departure And Variance For Acceptance Of Responsibility By Analogy To U.S.S.G. § 3E1.1.

The presentence report asserts that acceptance of responsibility makes no difference because the adjustment is swallowed by the offense level. If so, the acceptance of responsibility is a fact not adequately considered under the Guidelines and should result in a departure or variance. Otherwise, defendants who do not acknowledge the wrongfulness of their conduct are invariably treated the same as those who do.

The facts establish that Mohamed has clearly accepted responsibility for the conduct that brings him before the Court. *United States v. Ing*, 70 F.3d 553, 556 (9th Cir. 1995) ("We believe that the district court erroneously based the denial of an adjustment for acceptance of responsibility on Ing's decision to assert an entrapment defense."). The application notes interpreting § 3E1.1 provide that "a defendant may clearly demonstrate an acceptance of responsibility . . . even though he exercises his constitutional right to a trial." U.S.S.G. § 3E1.1 cmt. n.2. In *United States v. Cortes*, 299 F.3d 1030 (9th Cir. 2002), the Ninth Circuit recognized the defendant's burden to manifest "a genuine acceptance of responsibility for his *actions*." 299 F.3d at 1038 (quoting *United States v. McKinney*, 15 F.3d 849, 852 (9th Cir. 1996) (emphasis added)). In *Cortes*, the defendant

went to trial on the question of specific intent – an essential element of the crime of conviction.

*Cortes*, 299 F.3d at 1031-32.  The court noted that, if responsibility was otherwise demonstrated,

"exercise of his constitutionally protected rights cannot be held against him."  *Cortes*, 299 F.3d at

1038.  The Court explained that a defendant challenging guilt and confessing his actions was still

entitled to the reduction:

> The application notes interpreting § 3E1.1 provide that "a defendant may clearly
> demonstrate an acceptance of responsibility . . . even though he exercises his
> constitutional right to a trial."  This situation "may occur where a defendant goes to
> trial to assert and preserve issues that do not relate to factual guilt (*e.g.*, to make a
> constitutional challenge to a statute or a challenge to the applicability of a statute to
> his conduct)."  Though this passage lists only two circumstances where the
> acceptance of responsibility reduction may apply despite a defendant proceeding to
> trial, it was not intended to be an exhaustive list.  We have held in several instances
> that even "a defendant who contests his factual guilt may . . . be entitled to the
> § 3E1.1 adjustment.

*Cortes*, 299 F.3d at 1038 (citations omitted); *see also McKinney*, 15 F.3d at 852; *United States v.*

*Ochoa-Gaytan*, 265 F.3d 837, 843 (9th Cir. 2001); *United States v. Mohrbacher*, 182 F.3d 1041,

1042 (9th Cir. 1999).  The *Cortes* court cautioned that "employing a per se bar to the acceptance of

responsibility for going to trial to contest the issue of intent would impermissibly penalize citizens

for exercising his constitutional rights."  *Cortes*, 299 F.3d at 1039.

Although he went to trial, Mohamed provided early statements admitting the relevant conduct

and action upon which the prosecution was premised.

> The Guidelines make clear that the reduction for acceptance of responsibility is
> available '*without regard* to whether (a) conviction is based upon a guilty plea or a
> finding of guilt by the court or jury or the practical certainty of trial.'  U.S.S.G.
> § 3E1.1.

*United States v. Johnson*, 956 F.2d 894, 904 (9th Cir. 1992) (emphasis in original).  The Ninth

Circuit has held that acceptance reduction is available when a defendant contests his factual guilt at

**PAGE 43   DEFENDANT'S SENTENCING MEMORANDUM**

trial. *Cortes*, *supra*; *McKinney*, 15 F.3d at 853. A defendant who seeks outright acquittal or raises a factual defense is still entitled to a reduction for acceptance of responsibility if he or she otherwise qualifies. This is especially true when applied to the entrapment defense. As in *Ing*, Mohamed feels deep shame and remorse for his conduct in pressing the buttons, regardless of the role of the government. 70 F.3d at 556 ("At sentencing, he plainly acknowledged that what he did was wrong and expressed remorse for his actions."). The legal and policy questions regarding whether the government went too far under the unique facts of this case are related but distinct from the admitted moral culpability for committing a bad act.

Because the offense level exceeds the highest level of the guideline grid, the presentence report takes the position that the adjustment makes no difference. We disagree. The Court can consider a downward departure or variance for acceptance of responsibility based on circumstances of a kind not adequately taken into consideration by the guidelines. U.S.S.G. § 5K2.0(a)(2). In this case, Mohamed's genuine and early acceptance of responsibility merits consideration by the Court.

F.    **Although Mohamed's Case Is Unique, The Range Of Sentences Imposed In Other Sting Cases Establishes A Much Lower Range Than Provided By The Guidelines (18 U.S.C. § 3553(a)(6)).**

For the same reasons the Guidelines provide little meaningful assistance, the unique circumstances surrounding the offense and Mohamed make avoidance of sentencing disparities under 18 U.S.C. § 3553(a)(6) of little assistance. *United States v. Banulos-Rodriguez*, 215 F.3d 969, 974 (9th Cir. 2000) (en banc) (sentencing uniformity tied to national guidelines, not other individual cases). The government involvement in this offense makes it sui generis. Because the number of unique factors is so pervasive, and the universe of similar cases is so small, little guidance is provided other than that the Guidelines are wholly ineffective in determining a reasonable sentence.

The *Oregonian* has recently discussed the "likely" sentence the Court will impose based on six individual cases.  The reporter's prediction is based on a methodology rejected in the Ninth Circuit: "[T]he Court cannot increase [or decrease] sentences 'based on extraneous factors such as the punishment meted out to' those convicted of other offenses.'"  *Banuelos-Rodriguez*, 215 F.3d at 974 (quoting *United States v. Enriquez-Munoz*, 906 F.2d 1356, 1360 (9th Cir.1990)).  The Court anticipated exactly the types of problems created by the reference to an unrelated sentencing that would appear in the present case:  courts would be required to "assess the actual culpability" of defendants, which would "require sentencing courts to conduct involved and cumbersome evidentiary hearings."  *Id.*[2]  There are a number of cases involving stings, but those cases involve greater pre-contact involvement in planning or preparation for unlawful activity; in some cases they also involve the absence of sincere renunciation or other concrete steps of atonement, some involve significant prior criminal history.  Even so, the range of sentences imposed is far lower than what the Guidelines call for, which demonstrates that the Court should find them of little use in reaching an appropriate sentence.

This Court knows more about this case than any other judge in any other case from having presided over extensive pretrial motions and the trial.  Other individual cases cannot provide an accurate comparison because we cannot know all the facts and circumstances without holding mini-trials to point out the differences.  And ultimately, the judgment of other judges does not substitute for the two overarching duties of this Court.  First, Mohamed must be sentenced based on the individual facts of his case, with all their unique and unprecedented intricacies: "It has been

---

[2] The Ninth Circuit reaffirmed *Banuelos-Rodriguez* post-*Booker* in *United States v. Marcial-Santiago*, 447 F.3d 715, 717 n.3 (9th Cir. 2006).

**PAGE 45   DEFENDANT'S SENTENCING MEMORANDUM**

uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall*, 522 U.S. at 52. Second, the Court must apply all the sentencing factors to achieve the prime directive of federal sentencing: to reach a sentence sufficient but not greater than necessary to accomplish the purposes of sentencing. *Pepper*, 131 S.Ct. at 1242; *Spears v. United States*, 555 U.S. 261, 269 (2009) (citing *Kimbrough v. United States*, 552 U.S. 85, 101 (2007)).

## G.    Mohamed Should Not Receive A Harsher Sentence For Exercising His Right to Trial (Sixth Amendment).

The appropriate line for when the FBI goes too far in generating an offense is a policy question of utmost importance, separate from the moral culpability for the act, which Mohamed's remorse and apology fully recognize. A defendant cannot be punished for the exercise of constitutional rights. *United States v. Watt*, 910 F.2d 587, 592 (9th Cir. 1990) ("a sentencing court cannot consider against a defendant any constitutionally protected conduct."); *see Simmons v. United States*, 390 U.S. 377, 389 (1968) ("[W]e find it intolerable that one constitutional right should have to be surrendered in order to assert another."). Especially given that the defense provided the government with a complete statement through the proffer of the relevant facts, and, consistently with the proffer, the case was tried on the narrowly focused question of whether the government's evidence established beyond a reasonable doubt predisposition to commit the crime charged in the United States, Mohamed should not face harsher punishment for exercising his constitutional right to a jury trial.

**H.**    **The Government's Motion For A Downward Departure For Substantial Assistance Warrants An Additional Reduction Of The Sentence (28 U.S.C. § 994(n)).**

The government has indicated that a motion will be filed for a below Guidelines sentence based on substantial assistance.  The defense is providing a separate submission to the Court on this issue.  The requested consideration under the commentary to U.S.S.G. § 5K1.1 warrants that this Court first determine a reasonable sentence aside from substantial assistance and including renunciation, then should reduce the sentence by at least six years.

**I.**    **The Court Should Recommend A Designation Favoring Family Unification And Access To Programming (18 U.S.C. § 3621(b)).**

Counsel has contacted the Bureau of Prisons regarding the wide range of possible designations given the unusual facts of this case.  We request that the Court make a strong recommendation for designation to FCI Sheridan based on the importance of maintaining close family ties, Mohamed's demonstrated ability to do well with relatively low custody restraints during his pretrial incarceration, and – if applicable – the Court's observation of Mohamed during pretrial and trial proceedings.  In the event the BOP determines that an initial designation requires a higher security level, we request that the Court recommend in the alternative designation to the USP Atwater or USP Victorville because Mohamed has family in California and his nuclear family will be able to visit easier.  Wherever he is designated, we request that the Court recommend the greatest degree of access to communication with his family and the least amount of restriction as far as work and programming.  In light of the recommendations of the mental health professionals, we also request that the Court recommend participation in the Residential Drug Abuse Program with full access to the available community corrections at the end of the term of imprisonment.

**Conclusion**

The ten-year sentence requested by the defense is sufficient but not greater than necessary to meet the goals of sentencing. A greater sentence would unnecessarily compound the tragedy of this case. The requested sentence can be achieved through analysis of the Guidelines as well as by variance using the § 3553 factors. Under the Guidelines, using Criminal History Category I for the reasons set out above in section E(1), the recommended sentencing range could be calculated as follows:

| | |
|---|---|
| 43 | (starting offense level before departures) |
| - 2 | departure for acceptance of responsibility |
| - 4 | 5K1.1 cooperation departure |
| - 5 | departure based on the combination of circumstances set out above, including youth; vulnerability; imperfect entrapment; and post-offense rehabilitation. |
| 32 | Final Offense Level = range of 121-151 months at Criminal History Category I. |

A different combination of departures could also achieve the same result. The defense is asking for the low end of that range.

The Guidelines, however, provide only an imperfect tool for measuring culpability and considering the just sentence in this type of case. Too many factors relevant for sentencing are not taken into consideration by the guideline calculation. Rather than rely on the Guidelines to determine the fair sentence in this case, the Court can calculate the technical guideline range as required by law, and then rely on the factors under 18 U.S.C. § 3553(a) to determine the sentence. The table of contents from this memorandum provides a structure, based on the factors in 18 U.S.C. § 3553(a), for achieving a fair and reasoned result of a 120 months term of imprisonment.

Mohamed's life is worth saving: he will prove himself worthy of any mercy the Court can provide to temper what he knows will be a significant prison sentence. The family's indescribable

suffering at the loss of the eldest son should be mitigated to the extent possible. The community can heal knowing that Mohamed is sincerely remorseful and rejects the words and deeds that caused such fear and alarm.

Dated this 17th day of June, 2013.

/s/ Stephen R. Sady
Stephen R. Sady
Chief Deputy Federal Public Defender

/s/ Steven T. Wax
Steven T. Wax
Federal Public Defender

/s/ Lisa Hay
Lisa Hay
Assistant Federal Public Defender

# EXHIBIT A

# INVESTIGATION REPORT

**CASE:**          **MOHAMED OSMAN MOHAMUD**
                   **Case No. 3:10-cr-00475-KI**

**WITNESS:**       **HABIBO YUSUF MOHAMED**

**ATTORNEYS:**     **STEPHEN R. SADY**
                   **STEVEN T. WAX**

**INVESTIGATORS: CYNTHIA HAMILTON**
                   **JANAN STOLL**

**DATE:**          **June 25, 2011**

---

On the above date Janan Stoll and I met Habibo Mohamed at her home in NW Beaverton. Through the assistance of Somali interpreter, Hassan Abukar, we introduced ourselves as the investigators working on behalf of Mr. Mohamud and for his attorneys. Ms. Mohamed is Mr. Mohamud's maternal grandmother.

Ms. Mohamed is from Jowahar, which is 90 kilometers north of Mogadishu, Somali. She is 60 years old. Both of her parents died of "natural causes." Her father had 18 children with three wives. Ms. Mohamed's mother never remarried after her husband passed away.

Ms. Mohamed has never had any formal education. She married at 17 and had four children. When asked to describe her living situation growing up, she said, "It depended on where the animals grazed. We had goats and camels. We led a nomadic life and moved to areas that had lush grazing land. We did not live anywhere permanently. We lived in a traditional Somali hut that could be erected anywhere. The three mothers, my father's wives, lived in the same settlement. We moved together. Many families moved together, the neighbors, the whole community. I'd describe my early life as a good life. My father was not present most of the time. I had a good childhood. My mother was his number one wife. When I was young, we lived a nomadic life. My uncle raised me, mainly in the small town of Jowahar. My marriage was arranged. My husband was Isaq Mohamed. He was three years older than me."

Ms. Mohamed was asked if she loved her husband. She explained that in her culture and because her marriage was arranged that love was not involved. She said, "It was arranged when I was between seven and nine years old. He was my first cousin. I didn't care and I didn't object. If I didn't like it there would have been blood problems. I didn't want to disappoint my mother. My husband and I worked as a team. He worked in a sugar factory in Jowahar. I did not have children with my first husband."

**PAGE 1 - INVESTIGATION REPORT - WITNESS: HABIBO YUSUF MOHAMED - June 25, 2011**

Continuing, Ms. Mohamed said, "My first husband wanted a nomadic life and I wanted a city life. I didn't like the nomadic life. We were not together long. We divorced and I went to Mogadishu. I married again. My second husband was from the Abgaal tribe. He was Hassan Barre and the brother of Osman's father. Osman and Mariam are first cousins. I married Hassan when I was 18 and it was my choice. I had Mariam when I was 19. She was my first child. I was 21 when my next child, Mohamed, was born. He died as an infant of natural causes. We had high infant mortality. Hassan died of natural causes in his forties. I had huge responsibilities after he died. I worked in our store selling clothing, canned food and I was the only one working in the store. I raised my children in Mogadishu. Mariam, when she was older, worked in the store."

Ms. Mohamed added, "Mariam had half siblings. Hassan was married to someone else before me. He was already married with a wife when we married. I raised his two boys. The mother did not want the two boys. They were infants. I was content to raise the boys and they were with me until they married. They still call me all the time. I am their mother. I asked them how they are doing and they are just surviving. One is in Nairobi, Kenya and Mariam sends them money. The second one is in Mogadishu."

After Hassan passed away, Ms. Mohamed married Omar Iid, Ahmed, Monsoor and Hani's father. Ms. Mohamed said, "Omar was an engineer and he got contracts and built houses. I ran the store while the children were growing up."

Mariam, according to Ms. Mohamed, graduated from high school and married Osman Barre when she was 19. She added, "Mariam's marriage was not arranged. Osman would come and help with the children. He had been married, before marrying Mariam, and had children. My relatives would help watch my children when I worked at the store, especially my brother."

"Mariam was a very good, stable person. She was quiet and dependable and she did very well in school. She got along with Omar. She loved and respected him. When he died, we felt the burden of him being gone. He died in 2004."

When asked to describe what was going on in Mogadishu in 1991, the witness said, "Mariam was about two months pregnant when the civil war broke out. She was living within walking distance of me with Osman. There was intense warfare in Mogadishu which caused us to flee our house to the rural area."

Ms. Mohamed said her family and Osman Barre's family fled together on foot, approximately 16 miles, to get to her aunt's house in the country where they stayed for about two months. While they were gone, a mortar hit Ms. Mohamed's home, destroying it. She described it as a very difficult time. She said, "When we returned, everything I owned was gone. The war ruined our lifestyle. Every time there were hostilities we had to flee to my aunt's home. I cannot recall how many times we had to do this. This happened on many occasions."

Ms. Mohamed recalled having to close her store two to three years before the war broke out. There was no employment during the war and there were times when there was not enough food.

**PAGE 2 - INVESTIGATION REPORT - WITNESS: HABIBO YUSUF MOHAMED - June 25, 2011**

Ms. Mohamed said, "I was worried about the kids who might get only one meal a day. Of course, I don't want to remember this. It was a very bad time. Mariam was unable to eat correctly while she was pregnant. She would eat a little and would vomit. When we were walking back and forth to the countryside she would not eat at all. Some of the children were too young to walk and we had to carry them. Some of them were too big to carry, they were still young, and we would have to stop and wait for them. You would have to listen and not walk through areas where there was intense fighting. You had to be alert."

When asked who led the group, Ms. Mohamed said, "The fathers and me would collectively decide which route to take."

Ms. Mohamed said that when Mohamed was born there was a lull in the fighting. Ms. Mohamed said, "A friend of Osman's took them to the hospital. While Mariam was in the hospital, the situation again became tense and unsafe. We asked someone else with a car to bring Mariam back from the hospital which was far away. Mohamed was a very thin, tiny baby. Mariam could hardly eat and she was very thin as well. I was worried about Mariam but there was nothing I could do. When Osman and Mariam returned to their house, from the hospital, they found it empty because everything had been stolen while they were gone. When Mohamed was an infant, we continued fleeing to the countryside."

After a year and a half Osman left. Ms. Mohamed and her family lived in a house owned by Osman's father along with his family. There were 13 people living in the household. They continued fleeing to the countryside when the fighting got intense.

Ms. Mohamed stated, "There were constant mortar attacks. I can't count the number of times Mohamed would wake up frightened from the sounds of the explosions."

Ms. Mohamed said, "We were so lucky to have survived. No one was killed in our family. We were safe. There were so many who died. It was unbelievable. I can't even count how many died. So many died innocently sitting in their homes from the mortar attacks. There were many times when it was nonstop fighting day and night."

When asked what they ate when food was available, Ms. Mohamed said, "Sometimes we ate rice, grits, spaghetti, and some camel meat."

Before Osman left for Kenya, he was able to provide some contract services to get money for food.

Ms. Mohamed said, "I believe Osman left by bus or truck for Kenya. It was dangerous going. Some died trying to get out of the country. There was not an easy passage. Osman sent messages to Mariam that he arrived safely in Nairobi. There was time when Osman was living in Kenya when he lost contact with Mariam. He did not know where to send money for her support. After Osman was in the United States, he started working and sent for Mariam and Mohamed. They flew in a small plane to Kenya. By then, Mohamed was a toddler and was still very thin. I stayed in

**PAGE 3 - INVESTIGATION REPORT - WITNESS: HABIBO YUSUF MOHAMED - June 25, 2011**

Mogadishu after they left and things got even worse. We continued to have to escape from the fighting. Mariam and Mohamed stayed in Nairobi for a year and a half before flying back to Mogadishu. I don't know how they lived. They were both thin when they returned. Mohamed was two and a half years old. When I saw him I thought, 'Oh, my God, he is so very thin.' They stayed with us in Osman's father's house for about eight months. The situation continued to be unpredictable with periods of intense fighting. Every time there was an explosion Mohamed would run from one place to another in the house. He would not know where the shots were coming from and sometimes he would cry. Osman would send messages to Mariam with people who were coming to Mogadishu."

Mohamed was not yet three years old when he and Mariam flew back to Kenya. Ms. Mohamed said, "Osman was in the United States. There was not enough money for Mariam and Mohamed to go to the United States so Osman supported them by sending them money in Nairobi. Osman applied for Mariam and Mohamed to join him in the United States through the family reunification program. The main thing was safety and that is why they (Mariam and Mohamed) left again for Nairobi. She (Mariam) would send us money when she was in Nairobi and after she got to the United States. Once people got to the United States they would send money back to their families in Mogadishu, what they could afford."

Ms. Mohamed did not see Mariam again until 2004 when she came to the United States with four children. Ms. Mohamed said, "I was glad to leave Somalia where we lived in constant fear. I worried about the children's safety every day. I worried constantly if my children would come home from school."

After arriving in the United States, Ms. Mohamed and the four children lived with Mariam and her family in their apartment. They lived close to the mosque. Ms. Mohamed said, "We stayed with them for about sixty days and then we found a place of our own. My daughter did everything. Mohamed was doing well and was going to school. He was still thin. I didn't see any problems in the family when we first arrived."

Ms. Mohamed stated, "Sometimes I would worry when I heard traffic noises or sirens. I wondered what was going on. It reminded me of the difficulties back home. It was stressful."

Regarding Mohamed, the witness said, "When we first got here he was fine. He was going to school and the mosque. I first saw tensions about two years before his parents divorced. There were two years of tension. I can't pinpoint what caused the tension between Mariam and Osman. I don't know. It was too much for Mohamed. You could see his discontent, sadness and unhappiness when his parents got into conflicts. I saw that he was in emotional pain. They divorced after Mohamed graduated from high school and before he went to college. When Mariam and Osman were happily married Mohamed was okay with his father. After they divorced, there were many problems for Mohamed. He wouldn't listen to either one of them because there was no union. He definitely tried to talk them into staying together many, many times. But, they would not listen to him. It was difficult because he was a boy. The split affected him negatively. It damaged his

**PAGE 4 - INVESTIGATION REPORT - WITNESS: HABIBO YUSUF MOHAMED - June 25, 2011**

relationship especially with his father. After the divorce Mohamed was never happy and he was not at all happy when his father remarried during his first year of college."

When asked about Mohamed's religious inclinations, Ms. Mohamed said, "When I first came to the United States, he would go to the mosque once in awhile and there were times he would go a few times a day. He was conflicted that his parents were not more devout, from my own observations, that is what I know."

Ms. Mohamed said, "I know Mohamed very well. I took care of him when he was born. I took care of him when he was a little boy and after we came here he was at my house after school. He ate at my house after school. He was a good boy, very respectful. He treated me with the upmost respect. He never yelled or talked back to me. He always did as I asked. He would come to see me, talk with me, and he'd play with the kids here at my house.

Continuing, Ms. Mohamed said, "I have never seen Mohamed do anything strange. I've never seen him do anything bad. He spent a lot of time at my house. He studied his academics. He would help my sons with their homework and English. Mohamed was pleasant and good hearted. He had a good heart and was kind."

Additionally, the witness said, "I felt like Mohamed was depressed when his parents split. He was very exhausted last summer. I saw him working two jobs. He told me he had found one job and wanted another job. It was obvious he was exhausted. The family was demanding more and more because his father was gone. He would come straight home from work and cook for his family, for his mother. He'd come to my house and ask me if I had cooked and if I had not he would cook for me. Even when he was young you could tell what kind of child he was. He was always pleasant, a good boy, and very well behaved. He is someone that you would never suspect of doing something like this. He would never do anything to hurt anyone. My grandson, I would never imagine he would be arrested for this. It never occurred to me that he would attempt to hurt anyone. Some people you might suspect but he was better and more serious and straight than most others. He had good morals and was a good kid."

**PAGE 5 - INVESTIGATION REPORT - WITNESS: HABIBO YUSUF MOHAMED - June 25, 2011**

# EXHIBIT B

## INVESTIGATION REPORT

**CASE:**             **MOHAMED OSMAN MOHAMUD**
                        **Case No. 3:10-cr-00475-KI**

**WITNESS:**         **AHMED OMAR IID**

**ATTORNEYS:**      **STEPHEN R. SADY**
                        **STEVEN T. WAX**

**INVESTIGATORS: CYNTHIA HAMILTON**
                        **JANAN STOLL**

**DATE:**             **June 1, 2011**

---

On the above date Janan Stoll and I met Ahmed Iid. We interviewed him at the Federal Defender's office in Portland. We introduced ourselves as the investigators working on behalf of Mr. Mohamud and for his attorneys. This report addresses conditions in Somalia.

Mr. Iid is Mariam Barre's half brother. They have different fathers. Mr. Iid's father died in Somalia, when he was a freshman in high school. Mr. Iid immigrated from Ethiopia with his mother, brother, sister and nephew in the summer of 2004. Mr. Iid started his freshman year at Wilson High School and then transferred to Westview High School when the family moved to Beaverton.

Mr. Iid said, "We came here because it was not safe in Somalia. Mariam had already left. I knew Mohamed from when he was a little boy in Mogadishu. He lived close by us and we also lived together. He usually lived with his family. I helped take care of him. He was around three years old. He'd come and stay with us on the weekends before Osman left. We moved from house to house because of the fighting and the civil war. Osman had left and Mariam and her son lived with us. Later she moved to Kenya with Mohamed."

Continuing, Mr. Iid said, "Osman and Mariam got separated. They lost each other. It was bad times in Somalia. I remember people were dying and were hungry, they struggled. I remember the gun fire and we'd have to leave Mogadishu and go to the country. We would have to leave quickly and have to leave our food. I remember the bullets whizzing by."

Mr. Iid recalled armed guards coming into their home and asking which clan he was from. He said, "I told them and my mom intervened and acted like she was mad at me and told them we were from their clan to save our lives."

Mr. Iid said that after his sister, Mariam Barre, left for the United States he and the rest of his family took a bus to Ethiopia to escape the fighting in Somalia. He said, "We had no relatives

**PAGE 1 - INVESTIGATION REPORT - WITNESS: AHMED OMAR  IID - June 1, 2011**

in Ethiopia.  We rented a house with the money that Mariam sent us from America.  On June 4, 2004, we left Kenya and came to Portland.  We stayed one month with Mariam and her family. Mohamed was in middle school, in the 7th grade.  I did not know much about Mariam's family before we came.  They welcomed and supported us.  We moved right next door to them."

# EXHIBIT C

Dear Judge King,

My actions on November 26th were terrible. To think back to that day fills me with horror. I keep asking myself, "Is that really me on the tape?" My heart is filled with remorse, shame, sorrow, pain and misery every time I think about my actions on that day. I apologize and I am sorry to all the people I have hurt through my words and my actions. I have hurt not only my family and my friends, who had thought so well of me, but also my fellow Americans who trusted me as their fellow compatriot. I am sorry, and I hope they can forgive me.

The road from there has been a hard one. Both to come to terms with myself and to figure out where to go from here. I had to re-evaluate my whole life, question everything that I had ever believed and discover who I was and who I truly wanted to become. I decided I wanted to walk a better path. One that I could be proud of. I turned to books to expanding my mind and explore the words of others and see

where I could grow as a whole and let broader ideas into my mind. I had to mold myself to better learn from my past and avoid future mistakes. I sat with inmates and deputies who told me how my actions had personally affected them, and I felt ashamed. I am constantly reminded by my actions to be cautious about the choices I make. I am sorry and I regret it, not because of jail time but because my heart is truly in shock. To sit down and listen to the tapes has been the most humiliating experience of my entire life. To have to sit down and swallow all those horrible things I said and did has proven to be too much for me. I have to stop and take a break.

I can't change what happened, all I can do is try to make myself a better person and give back wherever I can. I have renounced and I again renounce my former beliefs. I am willing to speak to young Muslims to help keep them away from the path of extremism.

I hope that in the future I can be of service and help to the community and give back any way I can to make up for my actions. I give you my word to make the best use of my incarceration, to make myself a better person and to help my fellow inmates to do so as well.

Sincerely,



Dear Judge King,

My actions on November 26th were terrible. To think back to that day fills me with horror. I keep asking myself, "Is that really me on the tape?" My heart is filled with remorse, shame, sorrow, pain and misery every time I think about my actions on that day. I apologize and I am sorry to all the people I have hurt through my words and my actions. I have hurt not only my family and my friends, who had thought so well of me, but also my fellow Americans who trusted me as their fellow compatriot. I am sorry, and I hope they can forgive me.

The road from there has been a hard one. Both to come to terms with myself and to figure out where to go from here. I had to re-evaluate my whole life, question everything that I had ever believed and discover who I was and who I truly wanted to become. I decided I wanted to walk a better path. One that I could be proud of. I turned to books to expand my mind and explore the words of others and see where I could grow as a whole and let broader ideas into my mind. I had to mold myself to better learn from my past and avoid future mistakes. I sat with inmates and deputies who told me how my actions had personally affected them, and I felt ashamed. I am constantly reminded by my actions to be cautious about the choices I make. I am sorry and I regret it, not because of jail time but because my heart is truly in shock. to sit down and listen to the tapes has been the most humiliating experience of my entire life. To have to sit down and swallow all those horrible things I said and did has proven to be too much for me. I have to stop and take a break.

I can't change what happened, all I can do is try to make myself a better person and give back wherever I can. I have renounced and I again renounce my former beliefs. I am willing to speak to young Muslims to help keep them away from the path of extremism. I hope that in the future I can be of service and help to the community and give back any way I can to make up for my actions. I give you my word to make the best use of my incarceration, to make myself a better person and to help my fellow inmates to do so as well.

Sincerely,

Mohamed Osman Mohamud

# EXHIBIT D

Statement: On November 26th 2010, I, Mohamed Mohamud did something that I will forever be ashamed of. I understand alot of people must be upset, hurt and angry. And they have every right to be so. Although the situation is a very horrific one, it entails me to clear up a few things:

1) That I renounce all acts of violence especially killing, and innocent civilian, acts of terrorism regardless of their justification.

2) That the decisions I made do not represent in any way the teachings of Islam and the Quran. But rather the teachings of misguided scholars and individuals.

3) And that they also do not reflect the beliefs and attitudes of the somali and muslim community, as they have made it clear that they want to integrate into American society, not destroy it.

4) They also do not reflect the beliefs and attitudes of my family nor my upbringing and & I had followed what my family taught me then I would not have made such a terrible mistake.

I apologize to the American public for my actions, and that they received from me anything but the utmost love and respect.

Date : 12/22          X _____
                      Mohamed Osman Mohamud

statement:  On November 26th, 2010, I, Mohamed Mohamud, did something that I will forever be ashamed of. I understand alot of people must be upset, hurt, and angry. And they have every right to be so. Although the situation is a very horrific one, it entails me to clear up a few things:

1) That I renounce all acts of violence and especially killing innocent civilians, acts of terrorism regardless of their justification.
2) That the decisions I made do not represent in any way the teachings of Islam and the Quran. But rather the teachings of misguided scholars and individuals.
3) And that they also do not reflect the beliefs and attitudes of the Somali and Muslim community, as they have made it clear that they want to integrate into American society, not destroy it.
4) They also do not reflect the beliefs and attitudes of my family nor my upbringing and if I had followed what my family taught me then I would not have made such a terrible mistake.

I apologize to the American public for my actions and that they received from me anything but the utmost love and respect.

Date: 12/22                          x [signature]_____
                                     Mohamed Osman Mohamud

# EXHIBIT E



# EXHIBIT F

FD-302 (Rev. 5-8-10)

-1 of 1-



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    07/10/2012

As of August 2010, FBI, Counterterrorism Division, and Portland believed that MOHAMED MOHAMUD would not make any attempts to conduct a terrorist attack without specific direction from the UCEs. The available information supported this theory as it was entirely consistent with the direction given to MOHAMUD by the UCEs. As stated below, MOHAMUD had informed the UCE that he was interested in conducting a car bomb-style attack but did not know how to conduct such an attack, therefore decreasing the likelihood that MOHAMUD would attempt to conduct any type of attack without the UCEs. In the event MOHAMUD decided to act alone, Portland had extensive surveillance. Portland was prepared to immediately act had MOHAMUD attempted to act on his own.

As of October 5 and November 8, 2010, consistent with its earlier analysis, the FBI continued to assess that MOHAMUD would not make any attempts to conduct a terrorist attack without the UCEs. Portland continued to maintain extensive surveillance on MOHAMUD and remained prepared to act had it been necessary.

Investigation on   07/10/2012   at   Eugene, Oregon, United States (In Person)

File #   415F-PD-52880                                                        Date drafted   07/10/2012

by   DWYER RYAN

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

MOM011132

# EXHIBIT G



OREGON
HEALTH
&SCIENCE
UNIVERSITY

School of Medicine

**Department of Psychiatry**

Mail code: UHN80
3181 S.W. Sam Jackson Park Rd.
Portland, Oregon 97239-3098
tel: 503 494-8144
fax: 503 494-6152

June 6, 2013

To:     Federal Defenders Steven Wax & Stephen Sady
        101 SW Main St., Ste. 1700
        Portland, OR 97204

By:     J.D. Kinzie, Professor of Psychiatry-OHSU
        3363 SE 35th Place
        Portland, OR 97202

Re:     Mohamed Osman Mohamud

Introduction:

From 12/2010 - 3/4/2013 I interviewed Mr. Mohamud eleven times for about an hour's duration each time. I had two purposes for this: to determine his psychiatric status, i.e., if he suffers from any chronic or acute psychiatric disorders and, to assess issues of future dangerousness.

I have reviewed the attached psychological report of Linda Grounds, Ph.D., on Mr. Mohamud on December 19, 2012. In summary, her report indicates on the adult intelligence scales, he performed in the high average or superior range. The Personal Assessment Inventory yielded a valid profile revealing no significant clinical pathology. He made no effort to portray himself in more positive terms than accurate, and he had no symptoms of depression or anxiety or antisocial personality traits. Sub Scales that measure aggressive attitudes, verbal aggression or physical aggression were quite low. Her observations of his being cordial and respectful during the testing were consistent with my interviews. The test results were also consistent with my psychiatric evaluation. I have also reviewed the attached drug and alcohol assessment by Lily Mitchel. The facts and conclusions are consistent with Mr. Mohamud's descriptions of his drug and alcohol consumption and my diagnosis of dependence.

From the outset of the case, I have received and reviewed material from the defense including transcripts of the interactions with the agents, written material from the internet, transcripts of the trial, and the draft presentence investigation report.

June 6, 2013
Page 2

Initial Impressions:

Initially and throughout the interviews Mr. Mohamud was cooperative, non-defensive, forthcoming with information and generally showed a full range of affect; his behavioral responses are consistent with his verbal responses. He maintained an easy to relate to attitude throughout the eleven sessions and provided straightforward information although at times the chronology or historical data was confusing in regards to exact dates. I found no psychotic or neurotic major diagnosis at the first or following subsequent sessions.

He gave a history of drinking excessively, sometimes up to half a bottle of hard liquor a day, and use of marijuana, during the year prior to his arrest. He did have blackout spells, therefore I diagnosed drug and alcohol dependence. In addition, he was well oriented and had a good memory and fund of knowledge on mental status exam. However he did poorly on abstractions, i.e., giving abstract understanding of similarities and proverbs.

Throughout my interviews with Mr. Mohamud I found him consistent in his account of his behavior and thinking. I saw no evidence of effort to manipulate the interviewer or to put himself in a favorable light. His affect and his words are congruent, that is they are consistent with each other. The one significant change I have seen during the past two and a half years is significant maturation in Mr. Mohamud. He has clearly thought a great deal about his actions and his religion. While he still wants to practice Islam, he does so now with no anger. He appears to be much more at peace with himself today than he did when I first met him. Mr. Mohamud's reading and thinking while in the jail are quite impressive.

Developmental History:

Mr. Mohamud's first memory was of the airplane ride from Africa to the United States. He describes his early life with his family until ages of 8 or 9 as being very happy. He noted that the family was increasingly dysfunctional in that the parents were arguing or fighting, he became very unsettled by this. Around age 15 he started to question his religion and his identity as a black, American, Muslim and he was frustrated that he could not find any answers from his father, mother, or the Imam at the mosque. He began looking at jihadist web sites to find the true answers.

It was in this context of increasing family dysfunction that his behavior changed. Apparently the parents stopped functioning as a family; Mr. Mohamud was left to cook his own meals and take care of his younger sister. He felt increasingly angry towards his father, and his parents subsequently divorced after he finished high school.

During this time he became more obsessed with both his religion and his other life, a partying big man on campus. He was drinking much at this time and was considered to have multiple sexual exploits, which from his history weren't true. He had visions at this time of becoming admired for

June 6, 2013
Page 3

doing important things, including in the Islamic jihadist movement or in more conventional American ways. He felt that no one could tell him the right way to go in terms of other Islamic approaches. When he left for college he became less involved with jihadist movements, while becoming very involved in partying a great deal, drinking and ignoring school work, subsequently leading to deteriorating grades. He centered his life around heroism of some kind or on how he could show his extraordinary abilities. He continued to party, but he also continued to pray five times a day. During the time after his trip to Alaska was thwarted, he indicated he went through a period of depression.

Early on in the sessions, he expressed a renunciation of violence; he read the Koran more and got more understanding of his behavior and expressed that killing civilians was not appropriate or allowed under Islamic law. He also recognized that a violent act was at issue and he expressed to me opposition to such acts. He became more academically inclined, reading a great deal, and he voiced being particularly impressed with the history of Nelson Mandela.

Assessment:

The facts of this case are difficult because the proposed harm was great. Part of the psychiatric assessment I have been engaged in is to assess how Mr. Mohamud could get to the point at which he was able to dial the phone. I do not see signs of psychopathy or sociopathy. The psychiatric assessment, rather, is of a person who suffered a significant identity crisis of adolescence. His last two years in high school and time in college were particularly vulnerable times for Mr. Mohamud. He experienced a constellation of significant psychological factors and events. These included severe family disruption, arguing, and finally a divorce of his parents. He had to change roles in that he had to take care of his sister as well as cooking for himself. He also received no support from his confusion about religion; this confusion continued when he spoke with an Imam and the Imam did not address some of his concerns about Islam. Additionally, he wanted to identify as being the big man on campus, drinking and partying and generally carousing with other students. He suffered from lack of adult leadership and role models, identity confusion both racially and religiously, and in terms of how to become an adult appropriately. He searched for a heroism role on campus, in movies, or as a jihadist.

In reviewing the offense conduct, I was struck by the degree to which the government's actions would influence someone with Mr. Mohamud's vulnerabilities. For someone searching for identity, the characters created by the agents provided compelling affirmations and answers that would encourage the negative influences on Mr. Mohamud from his internet and other contacts. Mr. Mohamud was adrift and looking for guidance. His conflicts and confusion were exacerbated by drugs and alcohol, which not only affected his judgment but triggered a significant cultural taboo that compounded his identity issues. As a psychiatrist, I have treated young people addressing complex identity issues and provided guidance that helped them safely through the maturation process. The

June 6, 2013
Page 4

testimony of his friends and relatives is consistent with what I saw and reinforces my assessment of his low risk of future dangerousness.

There are a number of psychological factors that mitigate the degree of potential for danger in the future. One is the presence or absence of personality disorders or mental illness. Again, my impression is that there is no evidence of antisocial personality disorder or other mental illness that would indicate violent or dangerous behavior. He displayed no anger, irritability or aggression toward any persons in the eleven sessions. Despite the nature of his charge, there is no other indication of future dangerousness from a psychiatric point of view. He articulates a sincere rejection of violence while also taking concrete steps to distance himself from extremism by both assisting the government and becoming closer with his parents. He states that he felt he had to harden himself in a bad way to commit the offense and is relieved to express apology and remorse. His history of appropriate values and behavior prior to his radicalization, combined with the shame for accepting criminal violence, make future involvement in this type of behavior highly unlikely. I recommend that he become involved in counseling to help maintain sobriety as well as to assist in reintegration following his incarceration. I also strongly recommend that he be housed as close as possible to his parents with maximum communication with them encouraged, as well as the least restrictive security level based on his pretrial conduct and based on the desirability of keeping him from being taken advantage of by sophisticated and experienced criminals.

J. David Kinzie, MD
Professor of Psychiatry
Oregon Health & Science University

JDK/jcd
attachments

VITAE
**J. DAVID KINZIE, M.D., F.A.C. Psych.**

**PRESENT POSITION**

Professor of Psychiatry
Past Director, PTSD Clinic
Past Director, Torture Treatment Center of Oregon
Past Director, Child Traumatic Stress Clinic
Psychiatrist, Intercultural Psychiatric Program
Department of Psychiatry
Oregon Health Sciences University

**OFFICE ADDRESS**

Department of Psychiatry, UHN 80
Oregon Health Sciences University
3181 SW Sam Jackson Park Road
Portland, Oregon  97239

**OFFICE PHONE**

(503) 494-6148

**HOME ADDRESS**

6111 NW Saltzman Rd
Portland, Oregon  97210

**HOME PHONE**

(503) 241-2535

**DATE OF BIRTH**

September 6, 1937

**PLACE OF BIRTH**

Wabash, Indiana

**CITIZEN**

U.S.

**LICENSURE**

Currently licensed to practice in Oregon and Washington
(limited)

**EDUCATION**

1955-1959

B.A. magna cum laude, mathematics major, LaVerne
College, LaVerne, California

1959-1963

M.D., University of Washington School of Medicine,
Seattle, Washington

1963-1964

Rotating internship, Alameda County Hospital, Oakland,
California

Vitae: J. David Kinzie, M.D.  -  Page 2

| | |
|---|---|
| 1966-1969 | Residency in general psychiatry, University of Washington Integrated Program, Seattle, Washington |
| 1969-1970 | Fellow in transcultural psychiatry, Honolulu, Hawaii, University of Hawaii Integrated Program |

## WORK EXPERIENCE

| | |
|---|---|
| Summer 1962 | Extern at Oregon State Hospital, Salem, Oregon |
| July 1964 - March 1965 | General medical physician with CARE/MEDICO: Provincial Hospital, Quang Ngai, Vietnam |
| March 1965 - July 1966 | Department of Aborigine Hospital, Gombak, Malaysia |
| 1970-1971 | Instructor in Psychiatry, University of Washington: Assigned to Faculty of Medicine, University of Malaya Responsibilities included:  teaching medical students, supervising medical officers (residents) on inpatient unit, directing outpatient clinical responsibilities, consultant to Gomback Agorigine Hospital |
| 1971 - 1974 | Assistant Professor of Psychiatry University of Hawaii School of Medicine |
| 1974 - 1976 | Associate Professor of Psychiatry Coordinator of Psychiatric Clerkship University of Hawaii School of Medicine |
| 1976 - July 1980 | Associate Professor of Psychiatry Oregon Health Sciences University Director of Residency Training Acting Director of Consultation-Liaison Service, 1976-1977 |
| July 1980 - Present | Professor of Psychiatry |
| July 1980 - December 1997 | Director of Clinical Services |
| July 1980 - July 1994 | Director of Indochinese Psychiatric Program |

|  |  |
|---|---|
|  | Oregon Health Sciences University<br>Currently Psychiatrist in IPP treating Cambodian patients |
| 1978 - 1986 | Medical Director of Ward 5A, Acute Psychiatric Inpatient Unit<br>Oregon Health Sciences University<br>Consultant to Vancouver Veterans Administration<br>Psychiatry Services |
| May 1981 - 1986 | Director of Clinical Services<br>Consultant, Study of Depression in Old Age<br>Department of Psychology, University of Oregon, Eugene |
| 1987 - 1988 | Acting Director, Adult Psychiatry Outpatient Clinic<br>Oregon Health Sciences University |
| July 1994 - December 1997 | Vice Chairman, Department of Psychiatry<br>Oregon Health Sciences University |
| July 1998 - 1999 | Acting CMO, Eastern Oregon Psychiatric Center |
| 1999-2010 | Psychiatrist in Intercultural Psychiatric Program, treating patients from Cambodia, Vietnam, Bosnia, Somalia, and Ethiopia. |

## AWARDS AND HONORS

Elected President of Associated Students, LaVerne College, 1958

Thesis Certificate in Psychiatry, University of Washington, 1963

Sol. Ginsberg Fellow, Group of Advancement of Psychiatry, 1967-1968
(Research Committee)

Award for Meritorious Service, Mental Health Association of Oregon, 1983

Co-winner, APA Gold Achievement Award for the Indochinese Psychiatric, 1986

Teaching Award for Outstanding Service, Oregon Health Sciences University, Department of Psychiatry Residency Training Program, 1988

Certificate of Special Appreciation: Mental Health and Developmental Disability Services Division, State of Oregon, May 1990

American Psychiatric Association, Nancy C.A. Roeske, M.D. Certificate of Recognition for Excellence in Medical Student Education, 1992

Distinguished Life Fellow, American Psychiatric Association, 2002

Fellow, American College of Psychiatrists, 2004

Doctor of Humane Letters, University of LaVerne, 2007

Kun-Po Soo Award, from American Psychiatric Association for contribution of Asian culture in relevance to psychiatry, October 2007

Vitae: J. David Kinzie, M.D.  -  Page 4

Life Achievement Award, World Association of Cultural Psychiatry, September 2009
Elected to Benjamin Rush Society, 2011

**CERTIFICATION**
Diplomate, American Boards of Psychiatry and Neurology, April 1973
Examiner, American Board of Psychiatry and Neurology, 1983 - 1986
Associate Examiner, American Board of Psychiatry and Neurology, 1987 to 2008

**PUBLICATIONS**

1.   Kinzie, J.D.:  Malaysia Aborigine Medical Program, Letter to the Editor.  *Journal of American Medical Association*, 197:163-164, 1966.

2.   Kinzie, J.D., Tyas, J., and Kinzie, K.:  A Comparative Health Survey Among Various Malayan Aborigine Tribes.  *Medical Journal of Malaya*, December, 1966.

3.   Kinzie, J.D. and Kinzie, K.:  The Jahai Negritos:  A Glimpse of a Culture in Transition.  *Federation Museums Journal*, States of Malaya, Kuala Lumpur, 11, 1966.

4.   Kinzie, J.D., Shore, J.H., and Pattison, E.M.:  Anatomy of Psychiatric Consultation to Rural Indians.  *Community Mental Health Journal*, Aug;8(3):196-207, 1972.

5.   Kinzie, J.D., Ryals, J., Cottington, F., and McDermott, J.F.:  Cross-Cultural Study of Depressive Symptoms in Hawaii.  *The International Journal of Social Psychiatry*, Spring;19(1):19-24, 1973.

6.   Marsella, J.A., Kinzie, J.D., and Gordon, P.:  Ethnic Variations in the Expressions of Depression.  *Journal of Cross-Cultural Psychology*, 4:435-458, 1973.

7.   Teoh, J.I., Kinzie, J.D., and Tan, E.S.:  Referrals to a Psychiatric Clinic in West Malaysia.  *The International Journal of Social Psychiatry*, Winter;18(4):301-307, 1973.

8.   Kinzie, J.D., Sushama, P.C., and Lee, M.:  Cross-Cultural Family Therapy - A Malaysian Experience.  *Family Process*, 11:59-67, 1972.

9.   Kinzie, J.D.:  Cross-Cultural Psychotherapy:  the Malaysian experience:  An Open System Model.  *American Journal of Psychotherapy*, Apr;26(2):220-231, 1972.

10.  Kinzie, J.D. and Simons, R.C.:  Outpatient Treatment of Psychotic Patients with a Long-Acting Phenothiazine:  Fluphenazine Decanoate.  *The Medical Journal of Malaya*, Dec;26(2):129-132, 1971.

11.    Kinzie, J.D., Teoh, J.I., and Tan, E.S.: Native Healers in Malaysia. In *Culture-Bound Syndromes, Ethnopsychiatry, and Alternate Therapies*. Honolulu, Hawaii: The University Press of Hawaii, Chapter 10, 1976.

12.    Shore, J.H., Kinzie, J.D., Hampson, J.L., and Pattison, E.M.: Psychiatric Epidemiology of an Indian Village. *Psychiatry*, Feb;36(1):70-81, 1973.

13.    Kinzie, J.D. and Bolton, J.M.: Psychiatry with the Aborigines of West Malaysia. *The American Journal of Psychiatry*, Jul;130(7):769-773, 1973.

14.    Yutiao, M. and Kinzie, J.D.: Consultation with the Filipino Boarding Home: An After-Care Facility in Hawaii. *The International Journal of Social Psychiatry*, Summer;21(2):130-136, 1975.

15.    Young, B.B. and Kinzie, J.D.: Psychiatric Consultation to a Filipino Community in Hawaii. *The American Journal of Psychiatry*, May;131(5):563-566, 1974.

16.    Kinzie, J.D., Teoh, J.I. and Tan, E.S.: Community Psychiatry in Malaysia. *The American Journal of Psychiatry*, May;131:573-577, 1974.

17.    Markoff, R.A., Kinzie, J.D., Botticelli, M.G., and Bolian, G.C.: A Simplified Guide to the Rational Use of Psychotropic Drugs. *Hawaii Medical Journal*, Jun;33(6): 201-206, 1974.

18.    McDermott, J.F., Maretzki, T.W., Hansen, M.J., Ponce, D.E., Tseng, W.S., and Kinzie, J.D.: American Psychiatry for Export: Special Training for Foreign Medical Graduates. *Journal of Medical Education*, May;49(5):431-437, 1974.

19.    Kinzie, J.D.: Psychiatric Epidemiology in Hawaii, in *A Review of the Literature in People and Culture in Hawaii: A Handbook for Mental Health Workers*. Department of Psychiatry, University of Hawaii. Pages 8-12, 1974.

20.    Kinzie, J.D. and Furakawa, E.: The Japanese of Hawaii, in *People and Culture in Hawaii: A Handbook for Mental Health Workers*, Department of Psychiatry, University of Hawaii. Pages 56-65, 1974.

21.    Kinzie, J.D. and Markoff, R.: A Systematic Approach to Sleep Disorders. Review and Treatment. *Hawaii Medical Journal*, Nov;33(11):412-417, 1974.

22.    Kinzie, J.D. and Tseng, W.S.: Cultural Aspects of Psychiatric Clinic Utilization A Cross-Cultural Study in Hawaii. *The International Journal of Social Psychiatry*, Autumn;24(3):177-188, 1978.

23.    Kinzie, J.D. and Jurgensen, R.A.: Modes of Experience and Psychiatric Education. *American Journal of Psychotherapy*, Apr;30(2):276-288, 1976.

24.    Kinzie, J.D.: Inter-Cultural Marriages - Problems and Challenges for Psychiatric Treatment. In *Adjustment in Intercultural Marriage.* Wen-Shing Tseng, John F. McDermott, and Thomas Maretzki [Eds.]. Honolulu: Department of Psychiatry, John A. Burns School of Medicine, University of Hawaii, 1977.

25.    Kinzie, J.D., Char, W.F., Markoff, R.A., and McDermott, J.F., Jr.: Objectives of Psychiatric Education in a Primary Care Curriculum. *Journal of Medical Education*, Aug;52(8):664-667, 1977.

26.    Shore, J.H., Kinzie, J.D., and Bloom, J.D.: Required Educational Objectives in Community Psychiatry. *The American Journal of Psychiatry*, Feb;136(2):193-195, 1979.

27.    Kinzie, J.D.: Lessons from Cross-Cultural Psychotherapy. *American Journal of Psychotherapy*, Oct;32(4):510-520, 1978.

28.    Sasser, M. and Kinzie, J.D.: Evaluation of Medical-Psychiatric Consultation. *International Journal of Psychiatry in Medicine*, 9(2):123-134, 1978-79.

29.    Bloom, J.D., Kinzie, J.D., and Shore, J.H.: Residency Curriculum in Forensic Psychiatry. *The American Journal of Psychiatry*, Jun;137(6):730-732, 1980.

30.    Kinzie, J.D., Tran, K.A., Breckenridge, A., and Bloom, J.D.: An Indochinese Refugee Psychiatric Clinic: Culturally Accepted Treatment Approaches. *The American Journal of Psychiatry*, Nov;137(11):1429-1432, 1980.

31.    Kinzie, J.D.: Evaluation and Psychotherapy of Indochinese Refugee Patients. *American Journal of Psychotherapy*, Apr;35(2):251-261, 1981.

32.    Kinzie, J.D., Manson, S.M., Vinh, D.T., Tolan, N.T., Anh, B., and Pho, T.N.: Development and Validation of a Vietnamese-Language Depression Rating Scale. *The American Journal of Psychiatry*, Oct;139(10):1276-1281, 1982.

33.    Kinzie, J.D.: The Establishment of Outpatient Mental Health Services for Southeast Asian Refugees. In *Refugee Mental Health in Resettlement Countries*, p. 217-230. Carolyn L. Williams and Joseph Westermeyer [Eds.], Washington DC: Hemisphere Publishing Corporation, p. 217-230, 1986.

34.    McFarland, B. and Kinzie, J.D.: Psychiatric Residents' Knowledge as a Function of Training Level. *Journal of Psychiatric Education*, 7:138-143, 1983.

35.   Faulkner, L.R., Rankin, R.M., Eaton, J.S. Jr., and Kinzie, J.D.:  The State Hospital as a Setting for Resident Education.  *Journal of Psychiatric Education*, 7:153-166, 1983.

36.   Neligh, G. and Kinzie, J.D.:  Therapeutic Relationships with the Chronic Patient.  In *New Directions in Mental Health Services, Effective Aftercare for the 80's*.  David Cutler, [Ed.], San Francisco, CA: Jossey-Bass, 1983.

37.   Kinzie, J.D., Fredrickson, R.H., Ben, R., Fleck, J., and Karls, W.:  Posttraumatic Stress Disorder Among Survivors of Cambodian Concentration Camps.  *The American Journal of Psychiatry*, May;141(5):645-650, 1984.

38.   Kinzie, J.D. and Manson, S.M.:  Five-Years' Experience with Indochinese Refugee Patients.  *Journal of Operational Psychiatry*, 14(2):105-111, 1983.

39.   Kinzie, J.D.:  The "Concentration-Camp Syndrome" among Cambodian Refugees.  In a book on post-1975 Cambodia, *The Cambodian Agony*.  David A. Ablin and Marlowe Hood, [Eds.].  Armonk, NY: M.E. Sharpe, 1987.

40.   Kinzie, J.D., Holmes, J.L., and Arent, J.:  Patients' Release of Medical Records: Involuntary, Uninformed Consent?  *Hospital and Community Psychiatry*, Aug;36(8):843-847, 1985.  Reprinted in *Journal American Medical Record Association*.

41.   Kinzie, J.D.:  Cultural Aspects of Psychiatric Treatment with Indochinese Refugees.  *American Journal of Social Psychiatry*, 5(1):47-53, 1985.

42.   Kinzie, J.D.:  Overview of Clinical Issues in the Treatment of Southeast Asian Refugees.  In *Southeast Asian Mental Health-Treatment, Prevention, Services, Training and Research*.  Tom Choken Owan, [Ed.].  Washington, DC: National Institute of Mental Health, p. 113-139, 1985.

43.   Boehnlein, J.K., Kinzie, J.D., Ben, R., and Fleck, J.:  One-Year Follow-Up Study of Posttraumatic Stress Disorder Among Survivors of Cambodian Concentration Camps.  *The American Journal of Psychiatry*, Aug;142(8):956-959, 1985.

44.   Bloom, J.D., Kinzie, J.D., and Manson, S.M.:  Halfway Around the World to Prison, Vietnamese in Oregon's Criminal Justice System.  *Medicine and Law*, 4(6):563-572, 1985.

45.   Faulkner, L.R., Kinzie, J.D., Angell, R., U'Ren, R., and Shore, J.H.:  A Comprehensive Psychiatric Formulation Model.  *Journal of Psychiatric Education*, 9(3):189-203, 1985.

46.   Kinzie, J.D., Sack, W.H., Angell, RH.., Manson, S.M., and Rath, B.:  The Psychiatric Effects of Massive Trauma on Cambodian Children  I. The Children.  *Journal of American Academy of Child and Adolescent Psychiatry*, 25(3):370-376, 1986.

47.   Sack, W.H., Angell, R.H., Kinzie, J.D., and Rath, B.:  The Psychiatric Effects of Massive Trauma on Cambodian Children  II. The Family, the Home, and the School.  *Journal of American Academy of Child and Adolescent Psychiatry*, 25(3):377-383, 1986.

48.   Kinzie, J.D., Lewinsohn, P., Maricle, R., and Teri, L.:  The Relationship of Depression to Medical Illness in an Older Community Population.  *Comphrensive Psychiatry*, May-Jun;27(3):241-246, 1986.

49.   Kinzie, J.D.:  Severe Post-Traumatic Stress Syndrome Among Cambodian Refugees: Symptoms, Clinical Course and Treatment Approaches.  In *Disaster Stress Studies: New Methods and Findings*, J.H. Shore (ed.), American Psychiatric Association Press, 1986, pages 123-139.

50.   Kinzie, J.D. and Manson, S.M.:  The Use of Self-Rating Scales in Cross-Cultural Psychiatry.  *Hospital and Community Psychiatry*, Feb;38(2):190-196, 1987.

51.   Kinzie, J.D. and Fleck, J.:  Psychotherapy with Severely Traumatized Refugees.  *American Journal of Psychotherapy*, Jan;41(1):82-94, 1987.

52.   Kinzie, J.D.:  The Psychiatric Effects of Massive Trauma on Cambodian Refugees.  In *Human Adaptation to Extreme Stress: From the Holocaust to Vietnam.*  John P. Wilson, Zev Harel, Boaz Kahana [Eds.], New York: Plenum Publishing Corporation, 1988.

53.   Kinzie, J.D., Leung, P., Boehnlein, J.K., and Fleck, J.:  Antidepressant Blood Levels in Southeast Asians: Clinical and Cultural Implications.  *The Journal of Nervous and Mental Disease,* Aug;175(8):480-485, 1987.

54.   Kinzie, J.D.:  Current Perspectives in Posttraumatic Stress Disorders.  *Western Journal of Medicine*, 147:71, 1987.

55.   Kinzie, J.D., Leung, P., Bui, A., Ben, R., Keopraseuth, K.O., Riley, C., Fleck, J., and Ades, M.:  Group Therapy with Southeast Asian Refugees.  *Community Mental Health Journal*, Summer;24(2):157-166, 1988.

56.   Kinzie, J.D.:  Therapeutic Approaches to Traumatized Cambodian Refugees.  *Journal of Traumatic Stress,* 2,1:75-91, 1989.

57.    Maricle, R.A., Kinzie, J.D., and Lewinsohn, P.: Medication-Associated Depression: A Two-and One-half Year Follow-Up of a Community Sample. *International Journal of Psychiatry and Medicine,* 18(3):283-292, 1988.

58.    Kinzie, J.D.: Post Traumatic Stress Disorder. In *Comprehensive Textbook of Psychiatry,* Kaplan and Sadack (Eds.), 5th Edition, pp. 1000-1008, 1990.

59.    Kinzie, J.D. and Leung, P.: Clonidine in Cambodian Patients with Posttraumatic Stress Disorder. *The Journal of Nervous and Mental Disease,* Sept;177(9):546-550, 1989.

60.    Kinzie, J.D and Boehnlein, J.K.: Post-traumatic Psychosis Among Cambodian Refugees. *Journal of Traumatic Stress*, 2(2):185-198, 1989.

61.    Kinzie, J.D, Sack, W., Angell, R., Clarke, G., and Ben, R.: A Three-year Follow-up of Cambodian Young People Traumatized as Children. *Journal of American Academy of Child and Adolescent Psychiatry*, Jul;28(4):501-504, 1989.

62.    Kinzie, J.D. and Sack, W.: Severely Traumatized Cambodian Children: Research Findings and Clinical Implications. In *Refugee Children Traumatized by War*, F.L. Ahiam (Ed.), John Hopkins University Press, Baltimore, 1991.

63.    Kinzie, J.D.: Post-Traumatic Effects and their Treatment Among Southeast Asian Refugees. In *International Handbook of Traumatic Stress Syndromes.* John P. Wilson and Beverely Raphael [Eds.], New York: Plenum Press, p. 311-319, 1993.

64.    Kinzie, J.D., Boehnlein, J.K., Leung, P.K., Moore, L.J.., Riley, C, and Smith, D.: The Prevalence of Posttraumatic Stress Disorder and its Clinical Significance Among Southeast Asian Refugees. *The American Journal of Psychiatry,* Jul;147(7):913-917, 1990.

65.    Kinzie, J.D.: Development, Staffing, and Structure of Psychiatric Clinics. In *Mental Health Services for Refugees*, (DHHS Publication NO. [ADM] 91-1824), pp. 146-156. J. Westermeyer, C.L. Williams, & A.N. Nguyen (eds), Washington, D.C., US Government Printing Office, Mar 1988.

66.    Kinzie, J.D. and Leung, P.: Psychiatric Care of Indochinese Americans. In *Culture, Ethnicity, and Mental Illness*, Albert C. Gaw [Ed.], American Psychiatric Publishing, Inc., 1993.

67.    Kinzie, J.D., Leung, P.K., Boehnlein, J., Matsunaga, D., Johnson, R., Manson, S., Shore, J.H., Heinz, J., and Williams, M.: Psychiatric Epidemiology of an Indian village. A 19-Year Replication Study. *The Journal of Nervous and Mental Disorder*, Jan;180(1):33-39, 1992.

68.   Kinzie, J.D.: Counter-transference in the Treatment of Southeast Asian Refugees. In *Beyond Empathy: Managing Affect and Counter-transference in Treatment of Post-traumatic Stress Disorder*, J.P. Wilson and J. Lindy (Eds.), Guilford Press, 1994.

69.   Kinzie, J.D., Maricle, R.A., Bloom, J.D., Leung, P.K., Goetz, R.R., Singer, C.M., and Hamilton, N.G.: Improving Quality Assurance through Psychiatric Mortality and Morbidity Conferences in a University Hospital. *Hospital and Community Psychiatry,* May;43(5):470-474, 1992.

70.   Boehnlein, J.K., Kinzie, J.D., Leung, P.K., Matsunaga D., Johnson R., and Shore J.H.: The Natural History of Medical and Psychiatric Disorders in an American Indian Community. *Cultural, Medicine and Psychiatry,* 16(4):543-554, 1992-93.

71.   Sack, W.H., Clarke, G., Him, C., Dickason, D, Goff, B., Lanham, K., and Kinzie, J.D.: A Six-Year Follow-up Study of Cambodian Refugee Adolescents Traumatized as Children. *Journal of the American Academy of Child and Adolescent Psychiatry,* Mar;32(2):431-437, 1993.

72.   Kinzie, J.D. and Boehnlein, J.: Psychotherapy of the Victims of Massive Violence: Countertransference and Ethical Issues. *American Journal of Psychotherapy,* Winter;47(1):90-102, 1993.

73.   Buchwald, D., Manson, S.M., Dinges, N.G., Keane, E.M., and Kinzie, J.D.: Prevalence of Depressive Symptoms Among Established Vietnamese Refugees in the United States: Detection in a Primary Care Setting. *Journal of General Internal Medicine,* Feb;8(2):76-81, 1993.

74.   Boehnlein, J.K. and Kinzie, J.D.: Commentary. DSM Diagnosis of Posttraumatic Stress Disorder and Cultural Sensitivity: A Response. *The Journal of Nervous and Mental Disease,* Sept;180(9):597-599, 1992.

75.   Buchwald, D., Manson, S.M., Brenneman, D.L., Dinges N.G., Keane, E.M. Beals, J., and Kinzie, J.D.: Screening for depression among newly arrived Vietnamese refugees in primary care settings. *The Western Journal of Medicine*, Oct; 163(4):341-345, 1995.

76.   Jenkins, J.H. and Kinzie, J.D.: Culture and the Diagnosis of Adjustment Disorders. In *Cultural Proposals and Supporting Papers for DSM-IV (3rd rev.)*, Mezzich, J.E., Kleinman, A., Fabrega, Jr., H., Good, B., Johnson-Powell, G., Lin, K-M., Manson, S., and Parron, D. (Eds.), 218-226, 1993.

77.    Somervell, P.D., Beals, J., Kinzie, J.D., Boehnlein, J., Leung, P., and Manson, S.M.:
Criterion Validity of the Center for Epidemiologic Studies Depression Scale in a
Population Sample from an American Indian Village. *Psychiatry Research,*
Jun;47(3):255-266, 1993.

78.    Somervell, P.D., Beals, J., Kinzie, J.D., Boehnlein, J., Leung, P.K., and Manson, S.M.:
Use of the CES-D in an American Indian Village. *Cultural, Medicine and Psychiatry,*
16(4):503-517, 1992.

79.    Leung, P.K., Kinzie, J.D., Boehnlein, J.K., and Shore, J.H.:  A Prospective Study of the
Natural Course of Alcoholism in a Native American Village. *Journal of Studies on
Alcohol,* Nov;54(6):733-738, 1993.

80.    Boehnlein, J.K., Kinzie, J.D., and Leung, P.K.:  Countertransference and Ethical
Principles for Treatment of Torture Survivors.  In *Caring for Victims of Torture.*  James
M. Jaranson and Michael K. Popkin [Eds.], Washington DC: American Psychiatric Press,
Inc., p. 173-184, 1998.

81.    Boehnlein, J.K., Leung, P.K, and Kinzie, J.D.:  Cambodian American Families.  In
*Working with Asian Americans: A Guide for Clinicians,* Evelyn Lee [Ed.], New York:
The Guilford Press, p. 37-45, 1997.

82.    Leung, P.K., Boehnlein J.K., and Kinzie, J.D.:  Vietnamese American Families.  In
*Working with Asian Americans:A Guide for Clinicians,* Evelyn Lee [Ed.], New York: The
Guilford Press, p. 153-164, 1997.

83.    Kinzie, J.D., Leung, P.K., and Boehnlein, J.K.:  Treatment of Depressive Disorders in
Refugees.  In *Working with Asian Americans: A Guide for Clinicians,* Evelyn Lee [Ed.],
New York: The Guilford Press, p. 265-274, 1997.

84.    Boehnlein, J.K. and Kinzie, J.D.:  Cultural Perspectives on Posttraumatic Stress Disorder.
In *Stressful Life Events II,* T. Miller [Ed.], International Universities Press, 1997.

85.    Kinzie, J.D. and Sack W.:  The Psychiatric Disorders Among Cambodian Adolescents:
The Effects of Severe Trauma.  In *Immigrant and Refugee Children and Their Families:
Clinical, Research, and Training Issues,* Fern J. Cramer Azima and Natalie Grizenko
[Eds.], Madison, CT : International Universities Press, Inc., p. 95-112, 2002.

86.    Kinzie, J.D., Sack, R.L., and Riley, C.M.:  The Polysomnographic Effects of Clonidine
on Sleep Disorders in Posttraumatic Stress Disorder:  A Pilot Study with Cambodian
Patients. *The Journal of Nervous and Mental Disease,* Oct;182(10):585-587, 1994.

87.   Kinzie, J.D.: Ethnicity and Psychopharmacology: The experience of Southeast Asians. In *Clinical Methods on Transcultural Psychiatry,* S. Okpaku [Ed.], APA Press, 1998.

88.   Kinzie, J.D. and Goetz, R.R.: A Century of Controversy Surrounding Posttraumatic Stress-Spectrum Syndromes: The Impact on DSM-III and DSM-IV. *Journal of Traumatic Stress,* Apr;9(2):159-179, 1996.

89.   Moffic, H.S. and Kinzie, J.D.: The History and Future of Cross-Cultural Psychiatric Services. *Community Mental Health Journal,* Dec;32(6):581-592,1996.

90.   Boehnlein, J.K. and Kinzie, J.D.: Refugee Trauma. *Transcultural Psychiatric Research Review,* 32:223-252, 1995.

91.   Kinzie, J.D., Boehnlein, J.K., and Sack, W.H.: The Effects of Massive Trauma on Cambodian Parents and Children. In *International Handbook of Multigenerational Legacies of Trauma*, Yael Danieli, [Ed.]. New York: Plenum Press, 1998.

92.   Kinzie, J.D.: Historical and Current Perspectives on Post-Traumatic Stress Disorder With Special Emphasis on Traumatized Refugees. *Malaysian Journal of Psychiatry,*

93.   Kinzie, J.D., Hancey, J., Wilson, W, and Harther, J.: Paroxetine and Offenders. A Pilot Study. In *International Journal of Offender Therapy and Comparative Criminology,* 40:285-292, 1996.

94.   Kinzie, J.D.: The Historical Relationship Between Psychiatry and the Major Religions. In *Psychiatry and Religion: The Convergence of Mind and Spirit*, James K. Boehnlein [Ed.]. American Psychiatric Association Press, Inc., 3-26, 2000.

95.   Kinzie, J.D.: The Question of Welfare Reform and Refugee Fo's Answer. *Community Mental Health Journal,* Apr;34(2):129-132. 1998.

96.   Kinzie, J.D., Denny, D., Riley, C., Boehnlein, J., McFarland, B., and Leung, P.: A Cross-Cultural Study of Reactivation of Posttraumatic Stress Disorder Symptoms: American and Cambodian Psychophysiological Response to Viewing Traumatic Video Scenes. *The Journal of Nervous and Mental Disease*, Nov;186(11):670-676, 1998.

97.   Kinzie, J.D. and Jaranson, J: Refugees and Asylum Seekers in Mental Health Consequences of Torture and Related Trauma, *Scientific Review Paper*. Guilford Press, ed by Keane, Gerrity and Tuma, 1998.

98.   Pynoos, R.S., Kinzie, J.D., and Gordon, M.: Children, Adolescents and Families Exposed to Torture and Related Trauma, *Scientific Review Paper*. Guilford Press, ed by Keane, Gerrity and Tuma, 1998.

99.    Silove, D. and Kinzie, J.D.:  Survivors of War Trauma, Mass Violence and Civilian Terror: an overview, *Scientific Review Paper*. Guilford Press, ed by Keane, Gerrity and Tuma.

100.    Kinzie, J.D.:  Professional Caregivers and Observers Issues. *Scientific Review Paper*. Guilford Press, ed by Keane, Gerrity and Tuma.

101.    Kinzie, J.D.:  Cross-cultural Treatment of PTSD, In: *Core Approaches for the Treatment of PTSD,* ed by J.P. Wilson, M.F. Friedman and J. Lindy, 2000.

102.    Kinzie, J.D.:  Concentration Camp Syndrome, In: *Encyclopedia of Stress,* ed by George Fink, Academic Press, 2000.

103.    Kinzie, J.D.:  Refugees, Stress in, In: *Encyclopedia of Stress,* ed by George Fink, Academic Press, 2000.

104.    Kinzie, J.D.:  The Southeast Asian Refugee: The Legacy of Severe Trauma, In: *Culture and Psychotherapy: A Guide to Clinical Practice.* Wen-Sheng Tseng, M.D. and Jon Stretzler, Washington D.C.: American Psychiatric Press, Inc., p. 173-192, 2001.

105.    Kluft, R.P., Bloom, S.L., and Kinzie, J.D.:  Treating Traumatized Patients and Victims of Violence.  In *Psychiatric Aspects of Violence: Issues in Prevention and Treatment.*  Carl C. Bell [Ed.], San Francisco, CA: Jossey-Bass, New Directions for Mental Health Services, Summer; (86), p. 79-102, 2000.

106.    Kinzie, J.D. and Boehnlein, J.K.:  A Behavioral Sciences Model in Education: Recognition and Management of Violence and its Effects. *Annals of Behavioral Science Medical Education,* 7:97-101, 2001.

107.    Kinzie, J.D.:  Psychotherapy for Massively Traumatized Refugees:  The Therapist Variable. *American Journal of Psychotherapy*, 55(4):475-490, 2001.

108.    Kinzie, J.D., Boehnlein, J.K., Riley, C., and Sparr, L.:  The Effects of September 11 on Traumatized Refugees:  Reactivation of Posttraumatic Stress Disorder. *The Journal of Nervous and Mental Disease*, Jul;190(7):437-441, 2002.

109.    Kinzie, J.D. and Friedman, M.J.:  Psychopharmacology for Refugee and Asylum-Seeker Patients.  In Broken Spirits: The Treatment of Traumatized Asylum Seekers, Refugees, War and Torture Victims.  John P. Wilson and Boris Drozdek [Eds.], New York: Brunner-Routledge, p. 579-600, 2004.

110.    Kinzie, J.D. and Leung, P.K.:  Culture and Outpatient Psychiatry.  In *Cultural*

*Competence in Clinical Psychiatry.* Wen-Shing, M.D. Tseng and Jon, M.D. Streltzer, [Eds.].  American Psychiatric Association, 2004.

111.    Kinzie, J.D.:  Cambodians and Massive Trauma: What We Have Learned after Twenty Years. In *Living With Terror, Working With Trauma: A Clinician's Handbook.*  Danielle Knafo [Ed.].  Rowman & Littlefield Publishers, Inc., p. 119-134, 2004.

112.    Boehnlein, J.K., Kinzie, J.D., Sekiya U., Riley, C, Pou, K., and Rosborough, B.:  A Ten-Year Treatment Outcome Study of Traumatized Cambodian Refugees.  *The Journal of Nervous and Mental Disease*, Oct;192(10):658-663, 2004.

113.    Lustig, S.L., Kia-Keating, M., Knight, W.G., Geltman, P., Ellis, H., Kinzie, J.D., Keane, T., and Saxe, G.N.:  Review of Child and Adolescent Refugee Mental Health.  *Journal of the American Academy of Child and Adolescent Psychiatry*, Jan 43(1):24-36, 2004.

114.    Kinzie, J.D.:  The Pain of the Tortured; What are we to think and what are we to feel.  *Open Space*, Fall 2004.

115.    Kinzie, J.D.: Some of the Effects of Terrorism on Refugees.  Chapters in *The Trauma of Terrorism Sharing Knowledge and Shared Care: An International Handbook.* U. Danieli, D. Brown and J Lills [Eds]. Haworth Maltreatment and Trauma Press, 2005.

116.    Hoffmann, C., McFarland, B.H., Kinzie, J.D., Bresler, L., Rakhlin, D., Wolf, S., and Kovas, A.E.:  Psychometric Properties of a Russian Version of the SF-12 Health Survey in a Refugee Population.  *Comprehensive Psychiatry*, Sep-Oct;46(5):390-397, 2005.

117.    Kinzie, J.D.:  Evil: A Psychiatric Perspective on Forensic Psychology.  *Influences of Evil* ed. By Tom Mason, 2005.

118.    Kinzie, J.D.:  Personal Reflection on Treating Traumatized Refugees. *Handbook of International Psychology*.  Gilbert Reyes and Gerard Jacobs [Ed]. Praeger Perspectives, 3:101-114, 2006.

119.    Kinzie, J.D., Cheng, K., Tsai, J., Riley, C.:  Traumatized refugee children: the case of individualized diagnosis of treatment.  *Journal of Nervous and Mental Diseases*.  194: 534-7, 2006.

120.    Wheeler, G.H., Brandon, D., Clemons, A., Riley, C., Kendall, J., Loviaux, D.L., and Kinzie, J.D.: Cortisol production rate in posttraumatic stress disorder.  *J Clin Endocrinal Metab*, 91:3486-9, 2006.

121.    Kinzie, J.D.: Immigrants and refugees: the psychiatric perspective.  *Transcultural*

*Psychiatry*; Dec 43(4): 577-591, 2006.

122.    Kinzie, J.D.: PTSD among traumatized refugees.  Chapter in *Understanding Trauma: Integrating Biological, Clinical, and Cultural Perspectives*. Laurence J. Kirmayer, Robert Lemelson, and Mark Bard [Ed.].  Cambridge University Press, pp 194-206, 2007.

123.    Boehnlein, JK and Kinzie, JD: Pharmacologic reduction of CNS noradrenergic activity in PTSD: the case for clonidine and prazosin. *Journal of Psychiatric Practice*; Mar 13(2): 72-78, 2007.

124.    Kinzie, JD. Combined psychosocial and pharmacological treatment of traumatized refugees. Chapter in *Cross-Cultural Assessment of Psychological Trauma and PTSD*. J.P. Wilson and C.C. So-Kum Tang [Eds]. Springer US; 359-369, 2007.

125.    Kinzie, JD, Jaranson JM, Kroupin GV: Diagnosis and treatment of mental illness. Chapter in *Immigrant Medicine*.  P.F. Walker and E.D. Barnett [Eds]. Saunders Elsevier; 639-651, 2007.

126.    Kinzie JD, Riley C, McFarland B, Hayes M, Boehnlein J, Leung P, Adams G.  High prevalence rates of diabetes and hypertension among refugee psychiatric patients.  J Nerv Ment Dis; Feb 196(2): 108-112, 2008.

127.    Boehnlein J, Leung P, Kinzie JD. Cross-cultural psychiatric residency training: the oregon experience. Academic Psychiatry; 32(4): 299-305, July-August 2008.

128.    Wong, EC, Kinzie JD, Kinzie JM. Stress, refugees, and trauma. Chapter in *Asian American Psychology: Current Perspectives*. N. Tewari and A.N. Alvarez [Eds]. Taylor & Francis Group; 441-462, 2009.

129.    Kinzie, JD. A model for treating refugees traumatized by violence. *Psychiatric Times*; 26(7): 43-45, July 2009.

130.    Kinzie JD & Kinzie JM. Treatment goals & therapeutic interactions.  Chapter in *The Mental Health of Refugees and Asylum Seekers*.  D. Bhugra, T. Craig, and K. Bhui [Eds]. (p. 121-140).Oxford University Press, 2010.

131.    Kinzie, JD:  Guidelines for the psychiatric care of torture survivors.  Torture Journal; 21: 18-26, 2011.

**20 Published BOOK REVIEWS**

Vitae: J. David Kinzie, M.D.  -  Page 16

Reviewer:  I have peer reviewed articles for the Journal of Nervous and Mental Disease, Journal of American Medical Association, Journal of Cross-Cultural Psychology, Journal of Traumatic Stress, Human Organization Culture, Psychiatry and Medicine, American Indian and Alaska Native Mental Health Research, Disease and Ethnicity, Pediatrics.


**SELECTED PRESENTATIONS: Multiple presentations at National & International** *meetings and 15 Grand Round Presentations at OHSU.*

# EXHIBIT H

## SAGEMAN CONSULTING LLC

• • • • •

PMB 222    402 King Farm Blvd Suite 125    Rockville MD 20850    USA

Marc Sageman MD PhD
Principal
301-208-6772
sageman@post.harvard.edu

Jody Sageman
Administrator
301-990-8692
jsageman@comcast.net

Mr. Stephen R. Sady
Chief Deputy Federal Public Defender
101 SW Main Street  Suite 1700
Portland, Oregon  97204

June 4, 2013

**Re: U.S. v. Mohamud**

 I interviewed Mohamed Osman Mohamud on 17 and 18 May 2012 for a total of seven and a half hours. This included a psychiatric evaluation. I also had the opportunity to interview Mr. Mohamud's parents on 17 May 2012 in the afternoon. I also had the opportunity to review the whole discovery material on Mr. Mohamud prior to his trial and was able to review the complete transcripts from the trial as well. I was also able to review the draft of the presentence report and sentencing recommendation as well as the comprehensive alcohol and drug assessment. The following assessment is based on the above material and my experience as a recognized expert in the field of terrorism and as a forensic psychiatrist.

 Mr. Mohamud was born on August 11, 1991 in Somalia and came to the United States with his mother on October 31, 1994. He grew up on the West Coast, mostly in the Portland area. His father was an engineer for Intel, and his mother a homemaker. He has two siblings, both born in the United States and younger than him. His childhood was generally uneventful and he grew up in an intact family. He did well in school and had a few close friends. At the age of 15, he started hanging out with religious friends around a mosque in Portland and became more religious. He became part of a group of young men, who talked about jihad and dreamt of glory. He also became active on the Internet, and participated in what are called jihadi websites. He graduated from high school in June 2009 and tried to go Yemen with a friend to study and meet an acquaintance, who would facilitate their trip there. His parents were afraid that he might go to Somalia and called the FBI to help them dissuade their son from traveling. Right after the call, Mr. Mohamud agreed to go to college and finish his education before he would travel abroad.

 Mr. Mohamud attended Oregon State University and studied engineering. During his freshman year, he alternated between partying including drinking alcohol and smoking marijuana, and short periods of religious piety. He was involved in an allegation of date rape, but the investigation was quickly dropped as being baseless. He finished his year with plans of going to Alaska to make money fishing with one of his college friends. When he arrived at the airport to embark on the plane, he was told he could not fly because he was on a no-fly list. He was very

disappointed and depressed by this incident, and shortly thereafter, FBI undercover agents contacted him to participate in a plot to conduct an operation in Portland. He eventually acquiesced to the conspiracy and met the agents on multiple occasions leading to his arrest in November 2010 when he tried to detonate a truck bomb at a Christmas tree lighting celebration in downtown Portland.

During my interview with him, Mr. Mohamud said that he had given up on his extremist views and ideas. The time in jail has allowed him to read, deepen his understanding of his religion and its true meaning, and he has learned that he was wrong to interpret his religion in such an extremist way. He was very sorry about what had happened and specifically his role in the plot. He said, "It was wrong. I wish someone could have steered me in the right direction." In jail, he was focusing on what he could do to fix what had happened. He seemed to have adapted well in the jail, and was quite collaborative with the correctional officers.

In terms of his mental health, Mr. Mohamud displayed no signs or symptoms of any mental disorder. He was doing well, given his environment, and was trying to make sense of what had happened to him. He had good insight into his situation and was very remorseful about his past behavior. He had no symptoms of any personality disorder and no sign of psychopathy. Prior to his arrest, he had no history of any violent behavior.

In terms of future dangerousness, Mr. Mohamud had no past history of personal violence. Therefore, there is no indication of future criminal violence as he displays no risk factors for such violence. In terms of potential for future political violence, he has given up his extremist ideology. During the interview, and from observations of his parents and the correctional facility staff, he seems transparent and heartfelt. His remorse at what he has done seems sincere. He has matured during his detention and understands what he did wrong through his readings now that he had time to examine the error of his past ideas. The very short literature on terrorist recidivism shows that the potential for violence is directly related to maintaining extremist ideas. Mr. Mohamud's case is unique as he has completely given up his extremist ideology and he understands where he went wrong. Therefore, he is no longer susceptible to any temptation to join a violent group. He is at very low risk of being dangerous in the future, both in the criminal and political sense.

Very sincerely yours,

Marc Sageman, M.D.

Marc Sageman, M.D., Ph.D.

Forensic Psychiatrist and Consultant on Political Violence

# EXHIBIT I

# Mohamed Mohamud's Reading List

- *Grapes of Wrath*, John Steinbeck
- *The Looming Tower*, Lawrence Wright
- *Ani Difranco Righteous Babe*, Raffaele Quirino
- *The English Patient*, Michael Ondaatje
- *The Corporate Control of Life*, Nandana Shiva
- *Free Culture*, Lawrence Lessig
- *The Black Banners*, Ali Soufan
- *A Room With a View*, E.M. Forster
- *The Live Earth Global Warming Survival Handbook*, David de Rothschild
- *Letters to a Young Poet*, Rainer Maria Rilke
- *Towards a Fiqh for Minorities*, Taha Jabir Al-Alwani
- *A Portrait of the Artist as a Young Man*, James Joyce
- *The Prophet Muhammad: A Role Model for Muslim Minorities*, Muhammad Yasin Mazhar Siddiqi
- *The Autobiography of Malcom X,* as told to Alex Haley
- *Malcolm X A Life of Reinvention*, Manning Marable
- *The Collected Poems of Emily Dickinson*
- *Food and Healing*, Annemarie Colbin
- *The Best Science Writing Online 2012*, Bora Zivkovic
- *The Alienist*, Caleb Carr
- *Slaughterhouse Five*, Kurt Vonnegut
- *The Jungle*, Upton Sinclair
- *Doctor Zhivago*, Boris Pasternak
- *Extremely Loud and Incredibly Close*, Johnathan Safran Foer
- *Zen and the Art of Motorcycle Maintenance*
- *Odd Forever*, Dean Koontz
- *The Other Wes Moore*, Wes Moore
- *The Year of the Hare*, Arto Passilinna
- *How to be Good*, Nick Hornsby
- *Empire of the Summer Moon*, S.C. Gwyne
- *Just Kids*, Patti Smith
- *North of North a Write Around Portland Anthology Spring 09/Volume II/Number 1*
- *Endurance*, Alfred Lansing
- *The Prince and the Pauper*, Mark Twain
- *Red Badge of Courage*, Stephen Crane
- *Mindless Eating: Why We Eat More Than We Think*, Brian Wansink
- *The Odyssey,* translated by D.C.H. Rieu
- *Chicken Soup for the Prisoner's Soul*
- *Love in the Present Tense*, Morrie and Arleah Shechtman
- *The Devil's Dictionary*, Ambrose Bierce
- *Phraseology*, by Barbara Ann Kipfer

- *The Man in the High Castle*, Philip K. Dick
- *Crazy Enough*, Storm Large
- *What's Your Story: A Young Person's Guide to Writing Fiction*, Marion Dane Bauer
- *Free and Other Stories*, Anika Nailah
- *Chicken Soup for the Pet Lover's Soul*
- *Alias Grace*, Margaret Atwood
- *Fahrenheit 451*, Ray Bradbury
- *Animal Farm*, George Orwell
- *The Arabian Nights (1001 Nights)*, translated by Husain Haddawy
- *A History of the World in 6 Glasses*, Tom Standage
- *The Boy in the Striped Pajamas*, John Boyne
- *Emergency*, Mark Brown
- *The Pianist*, Wladyslaw Szpilman
- *Stuffed (an insider's look at who's really making America fat and how the food industry can fix it)*, Hank Cardello with Doug Carr
- *Che: The Diaries of Ernesto Che Guevara*
- *The Diving Bell and the Butterfly*, Jean-Dominique Bauby
- *Into the Wild*, Jon Krakauer
- *It's the Little Things*, Lena Williams
- *Every War has Two Losers*, William Stafford
- *As I Remember, Adam*, Angus L. Bowmer
- *Don Quixote*, Miguel de Cervantes
- *Pride & Prejudice*, Jane Austen
- *Brother Odd*, Dean Koontz
- *Serving Time, Serving Others*, Tom & Laura Lagara
- *The History of Love*, Nicole Krauss
- *The Queen in Winter*, Lynn Kurland, Sharon Shinn, Claire Delacroix, Sarah Monette
- *Born to Run*, Chris McDougall
- *The Man Who Collected Machen and Other Weird Tales*, Mark Samuels
- *Johnny Cash: I See Darkness – a graphic novel*, Reinhard Kleist
- *Chicken Soup for the Parent's Soul*
- *The Lewis & Clark Expedition* (the original journals)
- *The House of the Dead*, Fyodor Dostoevsky
- *How to Raise a Child With a High IQ*, Lawrence Shapiro
- *Defending the Spirit – A Black Life In America*, Randall Robinson
- *The Blue Zones*, Dan Buettner
- *Chew on This*, Eric Schloster and Charles Wilson
- *Roget's Thesaurus*
- *The American Heritage Dictionary*
- *The Quran (Arabic & English)*
- *Invictus*, John Carlin
- *Technopoly: the Surrender of Culture to Technology*, Neil Postman
- *2012 World Almanac*

Page 2

- *Man's Search for Meaning*, Viktor E. Frankl
- *Harvest of Empire*, Juan Gonzalez
- *My Stroke of Insight*, Jill Bolte Taylor
- *Dreams From My Father*, President Barack Obama
- *Poor Folk*, Fyodor Dostoyevsky
- *The Good Son*, Michael Gruber
- *Driven to Distraction*, Edward M. Hallowell & John J. Ratey
- *Being Wrong*, Kathryn Schulz
- *Minhajul Abideen The Best Way For Worshippers*, Imam Al-Ghazali
- *Riyadh As-Salihin (Gardens of the Righteous)*, Imam Nawasri
- *Raheeq Al-Makhtum (The Sealed Nectar)*
- *The Complete Idiot's Guide to Chess 3rd Edition*, Patrick Wolff
- *Drawing With the Right Side of Our Brain 3rd Edition*, Betty Edwards
- *Does a Bear Sh\*t in the Woods?*, Caroline Taggart
- *The League of Extraordinary Gentlemen*, Alan Moore (volume 1)
- *Coyote Wisdom: The Power of Story in Healing*, Lewis Mehl-Madrona
- *Under the Banner of Heaven: A Story of Violent Faith*, Jon Krakauer
- *Listening Is An Act of Love – Celebration of American Life*, from the Story Corps Project
- *The First and Second Discourses*, Jean-Jacques Rousseau
- *Some Secrets of the Quran*, Harun Yahya
- *50 Righteous and Humane Concepts brought by Muhammad*, Jalal Abu Al Rub
- *The Road*, Cormac McCarthy
- *The Book of Unholy Mischief*, Elle Newmark
- *Here's to You, Jesusa!*, Elena Poniatowska
- *Best of Dee Brown's West – An Anthology*, Edited by Stan Banash
- *Bull Run*, Paul Fleischman
- *The Hunger Games*, Suzanne Collins
- *The Prize Winner of Defiance, Ohio*, Terry Ryan
- *Politics For Dummies*, Ann DeLaney
- *The Importance of Conscience in the Quran*, Haran Yahya
- *Justice and Tolerance in the Quran*, Harun Yahya
- *Guidance from Hadith and Sunnah*, Dr. Mazhar V. Kazi
- *The Complete Idiot's Guide to Writing Well*, Laurie Rozakir Ph.D.
- *Missouri Boy*, Leland Myrick
- *The Language of Love*, Gary Smalley and John Trent Ph.D.
- *World's Great Men of Color Volume 1*, J.A. Rogers
- *Solving the 24 Problems Men Face: The Man in the Mirror*, Patrick Morley
- *Cosmos the Book*, Carl Sagan
- *The Ultimate Athlete*, George Leonard
- *Johnathan Livingston Seagull*, Richard Bach
- *Choke*, Chuck Palahniuk
- *Reasons and Occasions of Revelation of the Holy Quran*, translated by Haytham Kreidly
- *Al-Jinn*, Ahmad H. Sakr

- *The Key to Your Expected End*, Katie Souza
- *Science, Sense and Soul*, Casey Blood Ph.D.
- *The Illustrated World's Religions*, Huston Smith
- *John Constantine Hellblazer: Original Sins*, Jamie Delano
- *Lee Hammond's Big Book of Drawing*
- *For Whom the Bell Tolls*, Ernest Hemingway
- *The Purpose Driven Life*, Rick Warren
- *Swamp Thing Love in Vain*, Joshua Dysart
- *Hatha Yoga*, Illustrated by Martin Kirk, Brooke Boon and Daniel DiTuro
- *Brave New World*, Aldous Huxley
- *Brave New World Revisited*, Aldous Huxley
- *Dear America: Letters Home from Vietnam*, edited by Bernard Edelman
- *The Golden Compass* ,Philip Pullman
- *Mom: A Celebration of Mothers from Story Corps*, Dave Isay
- *Luck is no Accident*, by John D. Krumboltz & Al S. Levin.
- *Grow Up*, Ben Brooks
- *168 Hours: You Have More Time Than You Think*, Laura Vanderkam
- *Moonwalking with Einstein*, Joshua Foer
- *Willpower: Rediscovering the Greatest Human Strength*, Roy F. Baumeister & John Tierrey
- *Sex, Drugs, Gambling & Chocolate*, Dr. A. Thomas Horvath
- *Umar Ibn Al Khattab: His Life & Times Vol. 2*, Dr. Ali Sallabi
- *The Audacity of Hope*, Barack Obama
- *The Hot House: Life Inside Leavenworth Prison*, Pete Earley
- *The Subtle Knife*, Philip Pullman
- *The Amber Spyglass*, Philip Pullman
- *The Trial*, Franz Kafka
- *Midnight & the Meaning of Love*, Sister Souljah
- *Generation Hope: The Future's a Four Letter Word*, Kieron Gillen & Salva Espin
- *The Blue Octavo Notebooks*, Franz Kafka
- *The Walking Dead Graphic Novels*
- *A Zombie Apocalypse*, Keith Adam Luethke
- *Mockingjay*, Suzanne Collins
- *The Analects of Confucius*, translated by Roger T. Ames and Henry Rosemont.Jr.
- *Balzac and the Little Chinese Seamstress*, Dai Sijie
- *Stan Lee's How to Draw Comics*
- *The Metamorphosis*, Franz Kafka
- *Blueprints of the Afterlife*, Ryan Boudinot
- *Heaven for Kids*, Randy Alcorn
- *Confessions of an Economic Hitman*, John Perkins
- *Avengers the Origin*, Joe Casey & Phil Noto
- *Attack on Titan 1*, Sheldon Drzka
- *Blackbird 14*,  Kanoko Sakurakouji
- *Round About – a Write Around Portland Anthology Spring 12/Volume 14 #1*

Page 4

- *The Purity Principle*, Randy Alcorn
- *What Black Men Should Do Now*, K. Thomas Oglesby
- *A Brief Illustrated Guide to Islam*
- *Fiqh Essentials*, Saheeh International
- *An Nawawi's Forty Hadith*
- *Poetry for Dummies*, John Timpane with Maureen Watts
- *Roots*, Alex Haley
- *Good Poems for Hard Times*, selected by Garison Keillor
- *Black Indians*, William Loren Katz
- *Every Shut Eye Ain't Asleep: : An Anthology of Poetry by African Americans Since 1945*
- *The Man Who Japed*, Philip K. Dick
- *Persepolis 1 & 2*, Marjane Satrapi
- *Chicken Soup for the Soul*
- *Healing the Wounds of the Past*, T.D. Jakes
- *All There is Love*, Dave Isay
- *Collected Poems*, Dylan Thomas
- *Every Tongue Got to Confess: : Negro Folk-tales from the Gulf States*, Zora Neal Hurston
- *He-Motions*, T.D. Jakes
- *Q and A*, Zikas Swarup
- *Kafka Comes to America*, Steven T. Wax
- *One Flew Over the Cuckoo's Nest*, Ken Kesey
- *Cannery Row*, John Steinbeck
- *The Man from Margaritaville*, Jimmy Buffet
- *San Francisco (Growth of the City)*, Steve Bryant
- *Fearless*, Eric Blehm
- *The Complete Idiot's Guide to Creative Writing*
- *The Complete Idiot's Guide to Organizing Your Life*